William N. Ehlinger,
Plaintiff-Respondent-Cross-Appellant-Cross-
Petitioner,

v.

Jon A. Hauser and Evald Moulding, Inc.,
Defendants-Appellants-Cross-Respondents-
Petitioners.

Supreme Court

*No. 2007AP477. Oral argument September 15, 2009.
—Decided June 25, 2010.*

2010 WI 54

(Also reported in 785 N.W.2d 328.)

For the defendants-appellants-cross-respondents-petitioners there were briefs by *Gary A. Ahrens, Daniel J. Vaccaro, Monica M. Riederer,* and *Michael Best & Friedrich LLP,* Milwaukee, and *Kristen L. Hauser,* Watertown, and oral argument by *Gary A. Ahrens.*

For the plaintiff-respondent-cross-appellant-cross petitioner there were briefs by *Timothy W. Feeley, Sara J. MacCarthy,* and *Hall, Render, Killian, Heath & Lyman, P.C.,* Milwaukee, and oral argument by *Timothy W. Feeley.*

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on a petition and a cross-petition for review of a decision of the court of appeals.[1] It involves a contractual dispute between Jon Hauser ("Hauser") and Robert Ehlinger ("Ehlinger"), who are the joint and equal

---

[1] *See Ehlinger v. Hauser & Evald Moulding, Inc.,* 2008 WI App 123, 313 Wis. 2d 718, 758 N.W.2d 476, affirming decisions of the circuit court for Jefferson County, Jacqueline R. Erwin, J.

shareholders of Evald Moulding, Inc. ("Evald"), a Wisconsin corporation located in Watertown. The parties' Buy-Sell Agreement provides that if one of the shareholders becomes totally disabled, the non-disabled shareholder is entitled to purchase his shares at "book value."

¶ 2. Hauser contends that both the circuit court and court of appeals incorrectly concluded that the buyout agreement is unenforceable. First, he asserts that the circuit court erred when it determined that the undefined term "book value" rendered the buyout agreement unenforceable. Second, Hauser argues that the court of appeals incorrectly determined that supporting documentation is a necessary component of a computation under generally accepted accounting practices ("GAAP"). Third, he asserts that the circuit court erroneously exercised its discretion when it denied him further opportunity to challenge and counter the special magistrate's conclusions. He argues that the meaning of "book value" is ambiguous and that he is entitled to a trial to determine the intent of the parties.

¶ 3. We conclude that the circuit court did not err when it determined that the agreement was unenforceable. Both parties agree that Ehlinger is entitled to examine Evald's books to determine whether they accurately reflect the corporation's assets and liabilities, a task that the special magistrate was unable to perform due to the state of Evald's records. Accordingly, we need not resolve whether the contract is indefinite or ambiguous here because under these circumstances, it cannot be enforced.

¶ 4. Additionally, to the extent that Hauser's characterization of the court of appeals' decision is accurate, we determine that his argument about the scope of

GAAP fails. The question is not what is required under GAAP, but what is required to determine the parties' rights.

¶ 5. Finally, we conclude that the circuit court did not erroneously exercise its discretion when it denied Hauser the opportunity to subject the special magistrate to a broader scope of cross-examination, to depose the special magistrate, and to present his own expert witness in rebuttal.

¶ 6. In his cross-petition, Ehlinger argues that the circuit court erroneously permitted the defendants' litigation expenses to be paid by the corporation. This decision would not be erroneous if Hauser was entitled to indemnification or if Evald spent its assets in its own defense. We determine that Hauser was not entitled to indemnification by Evald according to the provisions of Wis. Stat. § 180.0855 (2007–08).[2] Further, under these facts, the litigation expenses were not incurred by the corporation for its own defense. Therefore, we conclude that the circuit court erroneously exercised its discretion when it permitted the corporation to pay Hauser's litigation expenses.[3]

---

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version.

[3] The first issue addresses whether the buyout agreement is unenforceable. Four justices (Chief Justice Abrahamson and Justices Bradley, Prosser, and Roggensack) conclude that the agreement is unenforceable, although they differ on the rationale. *See supra,* ¶ 3; concurrence, ¶ 122. Two justices (Justices Ziegler and Gableman) would remand to the circuit court for a determination of whether the contract is enforceable.

In regards to the second issue, all justices agree that we need not decide what is required to do a compilation under GAAP and that Hauser's argument fails.

¶ 7. Accordingly, we affirm the court of appeals as modified in this opinion and remand to the circuit court for the appointment of a receiver.[4]

I

¶ 8. The procedural history of this case is lengthy. It encompasses over seven years of litigation between two former friends, William Ehlinger and Jon Hauser, the sole and equal shareholders of Evald Moulding, Inc. Both men are corporate officers, but Hauser manages Evald's day-to-day operations.[5]

¶ 9. Evald's shareholders have not held a meeting since 2002, and they last successfully elected corporate officers in 1995. These failures are caused in part by an

Answering the third issue, four justices (Chief Justice Abrahamson and Justices Bradley, Prosser, and Roggensack) conclude that the circuit court did not erroneously exercise its discretion when it denied Hauser further opportunity to challenge and counter the special magistrate's conclusions. Two justices (Justices Ziegler and Gableman) would remand to the circuit court for further development on this issue.

Finally, the fourth issue is whether the circuit court erroneously permitted the corporation to pay Hauser's litigation expenses. Four justices (Chief Justice Abrahamson and Justices Bradley, Roggensack, and Ziegler) conclude that the circuit court erroneously exercised its discretion. Two justices (Justices Prosser and Gableman) conclude that the circuit court did not err.

[4] In appointing a receiver, the circuit court shall hold a hearing and describe the powers and duties of the receiver. Wis. Stat. §§ 180.1432(1), 180.1432(2). The receiver may sell the assets of the business in parts or as a whole. *See* Wis. Stat. § 180.1432(3)(a).

[5] Hauser is Evald's President, Chief Executive Officer, and Treasurer. He manages Evald's day-to-day operations. Ehlinger is Evald's Secretary.

293

ongoing dispute over the provisions of a Buy-Sell Agreement executed by Ehlinger and Hauser in 1992.[6]

¶ 10. The agreement provides for the transfer of a disabled shareholder's shares upon total disability.[7] The purchase price for the disabled shareholder's shares is set forth in the agreement as follows:

> For transfers of all of a Shareholder's stock . . . upon his becoming disabled, the purchase price of a Shareholder's shares of stock shall be $350,000.00 or Book Value whichever is greater . . . . For transfers of all of a Shareholder's stock on threat of involuntary transfer, the purchase price of a Shareholder's shares of stock shall be the book value of said shares as of the end of the last fiscal year.

The agreement was signed by Hauser and Ehlinger in their capacities as corporate officers and as shareholders. Shortly after the parties signed the agreement, Ehlinger developed Parkinson's Disease.

¶ 11. In December 2000, Ehlinger and Hauser met for dinner at a restaurant in Watertown. According

---

[6] The opening paragraph of the Buy-Sell Agreement states:

Agreement made this 14 day of August 1992, by and between William N. Ehlinger and his wife, Kathleen L. Ehlinger ("Ehlinger"), and Jon A. Hauser and his wife, Diana M. Hauser ("Hauser"), the Shareholders of all of the issued and outstanding stock of Evald Moulding Company, Inc., a Wisconsin Corporation ("the Corporation").

[7] Upon a Shareholder becoming totally disabled as defined hereafter, for a period of twenty-four (24) consecutive months, the other Shareholder shall have the first right to purchase all or part of the stock owned by the disabled Shareholder. . . . The disabled Shareholder or his legal representative shall sell all of the stock owned by the disabled Shareholder at the Agreed Purchase Price as defined in Section 6 hereof and upon the terms and conditions set forth herein.

to Hauser's notes, Ehlinger said that he had lost interest in the business and asked Hauser to make an offer to purchase his shares. The parties did not agree to any buyout terms at the meeting, but they did agree that Ehlinger was entitled to inspect Evald's books.

¶ 12. On June 20, 2001, Hauser sent a letter to Ehlinger invoking the disability buyout agreement. He stated that he intended to initiate the process of buying out Ehlinger's entire interest in Evald. The letter explained:

> According to Section 3 of the Agreement, when a shareholder becomes "totally disabled", that shareholder must sell their interest in Evald Moulding Company. Further, this section also states that the other shareholder has the first right to purchase this interest. Jon Hauser will act on this right to purchase your interest in Evald Moulding Company.

Hauser enclosed Evald's most recent fiscal year-end statement. Based on that statement, Hauser calculated the book value of Ehlinger's shares to be $431,400 and explained that the first payment installment would be sent "immediately upon the acceptance of this purchase offer." Ehlinger did not accept Hauser's offer.

¶ 13. Ehlinger called a meeting of the shareholders on April 22, 2002. He moved that Evald's books be audited in order to determine the value of the corporation, but Hauser declined to second the motion. The shareholders also attempted to hold their annual election of corporate officers, but due to deadlock, they were unable to do so.[8]

¶ 14. Hauser attempted to hold a closing on Ehlinger's shares. On April 30, he sent Ehlinger a check

---

[8] According to the April 22, 2002 minutes taken by Ehlinger and subsequently rejected by Hauser:

for $86,280, 20 percent of what Hauser calculated to be the book value of the shares. Ehlinger refused the offer and never cashed the check.

¶ 15. Ehlinger filed suit seeking judicial dissolution. He alleged that the shareholders of the corporation were at an impasse and had failed to elect officers for more than two successive years.

¶ 16. He also sought a declaratory judgment that the buyout agreement was "unenforceable for lack of essential terms," including the definition and means of determining "book value." Further, Ehlinger contended that even if the contract was enforceable, "determining the true book value would be difficult or impossible due to the way the defendant has kept Evald's books." He asserted that "[b]ecause of the ambiguity of the agreement and the defendant's subsequent actions there has never been a meeting of minds between the parties as to the meaning of book value in the 1992 Buy-Sell Agreement."[9]

¶ 17. The parties engaged in discovery. Both parties submitted expert reports purporting to determine the book value and fair market value of Evald. Discovery was completed in September 2003.

---

Mr. Ehlinger then nominated himself as a director for the coming year. Mr. Hauser then nominated himself as a director for the coming year. Mr. Ehlinger voted all of his shares for his election as a director and Mr. Hauser voted nay. Mr. Hauser voted all of his shares for his election, and Mr. Ehlinger voted nay. Since neither candidate received a vote of a majority of the shares, Mr. Hauser declared that neither candidate had been elected at the meeting and that, accordingly, both directors would remain in office by virtue of their previous election and continuing status as directors.

[9] Ehlinger also sought an accounting of Hauser and Ehlinger's partnership and an injunction preventing Hauser from voting Ehlinger's shares by proxy. These claims are not relevant to this appeal.

¶ 18. Ehlinger moved for summary judgment on two grounds. He argued that Hauser was not entitled to invoke the disability buyout agreement because Ehlinger was not "totally disabled" within the meaning of the agreement. Further, he sought summary judgment ordering the judicial dissolution of Evald due to shareholder impasse.

¶ 19. Hauser argued that no such impasse existed because the corporation had initiated the process of buying out Ehlinger's shares. As a result, Hauser contended, Ehlinger could dispute the price Evald would pay for the shares but he no longer had the authority to vote the shares. Hauser moved for summary judgment declaring that he had validly exercised the disability buyout agreement.

¶ 20. The court issued an order on January 12, 2004. It declined to grant summary judgment to either party regarding the enforceability or applicability of the buyout agreement. Instead, it concluded that there were material issues of fact in dispute.

¶ 21. Further, finding that the shareholders were deadlocked and had failed to elect officers for more than two successive years, the court ordered judicial dissolution pending resolution of the contract issue:

> The plaintiff's motion for summary judgment ordering the dissolution and liquidation of Evald Moulding Company, Inc. . . . and appointing a receiver to make an accounting of the financial affairs of Evald and to dispose of its business for the benefit of its shareholders is granted pending resolution of the parties dispute about defendant's exercise of the option to purchase plaintiff's shares. If defendant prevails, plaintiff's claim for dissolution will be moot. If plaintiff prevails, final judgment of dissolution will be entered.

¶ 22. The court determined that no alternative to dissolution could resolve the deadlock between the shareholders:

> While the defendant urges the Court to consider alternatives to dissolution, none resolve the impasse. One solution offered by the defendant is to order an accounting. This exercise has been undertaken at least once . . . and the underlying conflict continues. Nor will declaration of dividends, capital distribution or money damages provide adequate remedy. The shareholders have been deadlocked for years and remain so today without expectation of extrication.[10]

¶ 23. In May, July, and September of 2005, the court held a five-day bench trial on the applicability and enforceability of the buyout agreement. It found that Ehlinger was "totally disabled" within the meaning of the agreement. Further, the court determined that the agreement "requires the sale of the disabled shareholder's stock on the occurrence of total disability."

¶ 24. The court stopped short of ordering the sale and dismissing the action, however. It determined that there was an outstanding dispute about the enforceability of the agreement that required the court to address the meaning of the term "book value":

> The remedy sought by Mr. Hauser is dismissal. And I hesitate to dismiss the case because I perceive additional—an additional unresolved contract dispute

---

[10] Wis. Stat. § 180.1430(2)(a) permits a court to order dissolution of a corporation due to shareholder deadlock. Hauser has not appealed the grant of summary judgment ordering dissolution. Additionally, he has not argued on appeal that the circuit court erroneously exercised its discretion when it determined that grounds for dissolution existed.

298

> regarding the meaning of "book value" and I don't want to leave the parties without recourse in this lawsuit. I don't want to have you come back in some other forum and have that delay.
>
> . . . I don't want to dismiss if there are further contract terms[]like book value to be interpreted.
>
> . . . .
>
> And what I think I'm going to get from Plaintiff is that there is more than one way to calculate book value, and what I'm going to get from the Defendant is: This is how we have calculated book value for Evald by custom and practice and that's what's determinative.

Thus, the court retained jurisdiction of the case. Neither party objected.

¶ 25. The court ordered each party to provide a definition of "book value." It explained that the parties' definitions would be provided to a special magistrate, who would determine book value according to the court's instructions.

¶ 26. Both parties agreed that "book value" would be defined as "assets minus liabilities." They differed, however, on how to determine which assets and liabilities should be computed in the calculation, and what degree of verification was needed. Ehlinger argued that the company's financial statements were calculated for tax purposes and thus failed to represent the true worth of the assets of the corporation. He further asserted that deficiencies of supporting documentation "make clear that simply focusing on the definition of book value is too simplistic."

¶ 27. The court appointed Del Chmielewski, a certified public accountant, as the special magistrate. During a hearing held in October 2005, the court explained:

> [I]t's my present intention to instruct the Special Magistrate to review the subject year-end statement and report any deviation from the prior two-years' accounting method, and to report any deviation from generally-accepted accounting methods and to recalculate as necessary to come to book value. . . . [Y]ou're required to answer inquiries of the Special Magistrate, but I don't want any advocacy.

Further:

> When I say generally-accepted accounting principles, I don't mean to adopt any set of rules. I expect Mr. Chmielewski—[w]ho does plenty of books for plenty of small corporations—to know what's generally acceptable and what's not. And his conclusions could be subject to examination by you folks. You know, I just don't think this is going to be as much of an impediment or as mysterious as you folks fear. I think it's going to be real straightforward.

The court did not specify the statute under which the special magistrate was appointed, or whether he would perform the role of a referee or an expert.

¶ 28. Neither of the parties objected to the special magistrate's appointment or the instructions provided by the court. Hauser's attorney clarified:

> I think what the Court's saying is that Mr. Chmielewski is going to look at these things; he's going to say: . . . in these accounting situations is this good accounting or not? Is this reasonable, accurate accounting or not? If that's the way he's going to do it, I got no problem with that. I wouldn't want there to be some suggestion that there's an elaborate set of rules which is called GAAP in the sense of a formal reference . . . .

¶ 29. In an order setting out instructions for the special magistrate, the court stated:

300

The Court's special magistrate will determine Evald's March 31, 2001, book value using generally accepted accounting principles which are appropriate for the size, function and structure of this corporation. The special magistrate will advise the Court of any departures from GAAP in his report to the Court. Finally, the special magistrate will report any substantial inconsistencies in the reporting methodology used by Evald in 2001 vis a vis the previous two years.

Neither party objected to the order, and over the next several months, the special magistrate obtained documents from Evald.

¶ 30. During the course of his inquiry, the special magistrate discovered that it was impossible to verify Evald's financial statements. Some of the supporting documentation underlying Evald's computer summaries had been discarded or were otherwise unavailable.[11] The special magistrate determined that he could not confirm that the financial statements represented "book value."

¶ 31. Specifically, his May 8, 2006 report explained:

We have verified that all of the items on Evald's balance sheet have been recorded in accordance with GAAP for F/Y/E 3/31/01 except the following items. Evald has stated that they are not able to provide the information needed to verify items 1 through 5 because their computer software summarizes data and the information for the F/Y/E 3/31/01 is not retrievable.

(1) Physical inventory

(2) Accounts receivable and invoice cutoff procedures

---

[11] Hauser asserted that accounting detail information was lost in a computer system crash. Ehlinger did not argue that the loss of this information was intentional.

301

(3) Accounts payable and cutoff procedures

(4) The use of PO clearing account

(5) The use of IC clearing account

. . .

Since the value of the business is based on the balance sheet, it is necessary to have back up documents to support the numbers reported on the balance sheet. . . . Without verification of the aforementioned we cannot confirm that the items mentioned above, which are presented on Evald's balance sheet are generated in accordance to Generally Accepted Accounting Principles.

¶ 32. Ehlinger filed a motion asking the court to reconsider its prior decision that he was not entitled to a declaratory judgment. He asserted that the buyout agreement was not enforceable because the book value of Evald could not be calculated. Hauser opposed the motion, and the court set the matter for trial on June 29, 2006. Two days before trial, Hauser requested an opportunity to cross-examine the special magistrate.

¶ 33. At the outset of what the court expected would be a one-day trial, the court clarified the role of the special magistrate:

[O]ur primary purpose today is to address, see if we can determine book value to effectuate the Court's earlier order. I would like to give both counsel an opportunity to give me a brief statement, offer evidence that you might have, and then argument.

Regarding calling the special magistrate as witness, I didn't talk to Mr. Chmielewski about this, but I would allow either of you to question him regarding just a couple of things which are essentially clarification of

his reports. One is any arithmetical calculation he's made; two is what, what sources he had as a base to the figures that he used; and third, the opinions that he made in his report to the Court. He's not anybody's expert witness; but I would, if you have questions just on those aspects of his report, allow him to testify.

¶ 34. Hauser called Evald's accountant and book-keeper as fact witnesses. He called the accountant that Ehlinger had engaged as an expert witness. Additionally, he called the special magistrate as a witness and cross-examined him extensively. The examination of the special magistrate occupies 126 pages of the trial transcript.

¶ 35. The special magistrate testified that he was unable to calculate Evald's book value based on the financial records that were provided:

> The computer records that I [was] given really . . . were in summarized form. And so the standard that I'm trying to apply is difficult to apply in a summarized manner, because you haven't got any assurances as to what it's made up of because . . . the accounting procedures that happen on a day-to-day basis are kind of transparent, you can't see them. . . . And by being able to see that some normal accounting procedures were applied, then you can assure yourself that at least it looks like the documents were prepared properly to support the financial statement.

He testified that he was unable to validate 76 percent of Evald's assets and 90 percent of Evald's liabilities.

¶ 36. Hauser argued that the requisite information was available and blamed the special magistrate for failing to ask for it. Additionally, he requested that the court permit him to present an expert accountant to rebut the special magistrate's conclusions. The court

303

declined to do so, but it adjourned the trial until August so that the special magistrate could conduct more investigation:

> I deny your request for a—for time for you to have your own expert provide a report on book value. I will, however, assign the special magistrate to do as he testified this morning he could do, and that is, avail himself of those items which are available and which he mistakenly thought weren't . . . .

¶ 37. On August 10, 2006, four days before the trial was to recommence, Hauser submitted multiple documents to the court. They included a "motion in limine to exclude the expert opinion" of the special magistrate, a "motion for a deposition and full cross examination and the opportunity to present a rebuttal expert," and a "motion that no adverse inference from missing records is appropriate."

¶ 38. On August 11, the special magistrate submitted a revised report stating that he could not substantiate the balance for physical inventory, accounts receivable, or accounts payable. He explained that the problems were due to Evald's accounting software, which summarized reports:

> This summarizing caused a lot of reports, which any normal accounting system would have, to be unavailable for the F/Y/E 3/31/01. We could not view a detailed listing or subsidiary ledger report of the A/R aging report, the A/R account, the A/P account, the inventory account, the PO clearing account or the IC clearing account, as of 3/31/01.

¶ 39. The second day of trial was held on Monday, August 14. The court was unable to address Hauser's motions before receiving evidence because they were untimely.

¶ 40. Hauser again cross-examined the special magistrate at length. The special magistrate testified that he was unable to verify Evald's financial statements because the corporation had not retained subsidiary ledgers which were necessary to support the balance sheet.

¶ 41. In a written order dated November 29, 2006, the court determined that the term "book value" was indefinite, precluding the enforceability of the contract. The court concluded that it could not "cure the contract deficiency by grafting a requirement that the value be ascertained by using generally accepted accounting principles appropriate for a corporation of Evald Moulding's size, structure and function." Further:

> As the Court's special magistrate made his inquiry, report and presentation, it became clear that the parties' contractual term was too vague to cure. "Book value" could mean anything from simple adoption of the year end statement to an audited determination. The Court's attempt to give definite meaning to the contract term is as arbitrary as any other definition.
>
> Although the parties discussed waiting for the year end statement in their December 2000 meeting, any inference that this discussion ratified Defendants' definition of book value is vitiated by the parties' agreement to have Plaintiff review the books thereafter. The parties' conduct is insufficient to give definite meaning to the vague term.

(Citations omitted).

¶ 42. Hauser submitted a "motion for reconsideration, and for an order setting for trial the issue of the ambiguity of the term book value in the buy/sell agreement." He argued that "book value" was ambiguous rather than indefinite and that the court committed a

manifest error of law. At a January 2007 hearing, he reminded the court of the presumptive validity of contracts:

> Counsel: The law is very clear in Wisconsin that courts do not look for ways—look for fingerholes to void contracts.

> Court: Well, clearly not what I did here. I sought and struggled to try to hold this contract together.

The court denied his motion.

¶ 43. In February, Ehlinger submitted a motion, titled a motion for reconsideration, requesting an injunction prohibiting Hauser from directing the corporation to pay for the litigation expenses.[12] The court denied the motion, concluding that the corporation had an "interest" in the lawsuit and it would be "impossible as we sit here today" to assign fees between Hauser and the corporation.

¶ 44. Hauser appealed, and Ehlinger cross-appealed. The court of appeals affirmed the circuit court with some modification of its rationale.[13] *Ehlinger v. Hauser & Evald Moulding, Inc.*, 2008 WI App 123, 313 Wis. 2d 718, 758 N.W.2d 476. It did not determine that the term "book value" was indefinite. *Id.*, ¶ 30. Rather, it concluded that the term was ambiguous and that the circuit court resolved the ambiguity by reasonably determining that the parties intended "book value" to be calculated using GAAP

---

[12] Ehlinger had asked for a similar injunction on four occasions during the course of the litigation. The court never granted an injunction.

[13] The court of appeals' mandate neglected to acknowledge the necessity of remanding to the circuit court for further proceedings.

rather than by simply accepting the calculation listed on Evald's year-end statement. *Id.*, ¶ 31.

¶ 45. Regarding Ehlinger's cross-petition, the court of appeals concluded that the circuit court did not erroneously exercise its discretion when it determined that Evald's assets could be used to pay the defendants' litigation expenses. *Id.*, ¶¶ 46, 48. Additionally, it concluded that Hauser was entitled to corporate indemnification for his own litigation expenses. *Id.*, ¶ 48.

## II

¶ 46. This case requires us to examine several decisions of the circuit court and the court of appeals. We must determine whether the circuit court erred when it concluded that the undefined term "book value" rendered the buyout agreement unenforceable. In addition, we must determine whether the court of appeals erred by concluding that supporting documentation is a necessary component of a GAAP computation.

¶ 47. The interpretation of a contract is generally a question of law. *Levy v. Levy,* 130 Wis. 2d 523, 528–29, 388 N.W.2d 170 (1986). The necessary components of a GAAP computation is also a question of law. We determine questions of law independently of the conclusions rendered by the circuit court and the court of appeals. *Id.* at 529.

¶ 48. We also must determine whether the circuit court erroneously exercised its discretion when it denied Hauser further opportunity to challenge and counter the special magistrate's conclusions and when it permitted the corporation to fund the litigation expenses incurred in these proceedings. We will uphold

the circuit court's exercise of discretion if it "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, arrived at a conclusion that a reasonable judge could reach." *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd.*, 2004 WI 92, ¶ 21, 273 Wis. 2d 577, 682 N.W.2d 839.

## III

¶ 49. We begin by addressing the issues set forth in Hauser's petition for review. Hauser raises three issues: (A) did the circuit court err when it determined that the undefined term "book value" rendered the agreement unenforceable;[14] (B) did the court of appeals err by concluding that supporting documentation is a "necessary component" of a GAAP computation; and (C) did the circuit court erroneously exercise its discretion when it denied Hauser's motion to subject the special magistrate to complete cross-examination, to depose the special magistrate, and to present his own expert witness in rebuttal? We address these issues in turn.

## A

¶ 50. The disability buyout agreement sets the price for the disabled shareholder's shares at "book value." Nevertheless, the agreement does not define "book value." Both parties agree that in the absence of a contractual definition, "book value" refers to the value of the assets of a company after deducting its liabili-

_____

[14] In his brief to this court, Hauser contends that the court of appeals erred when it concluded that "book value" was ambiguous, but then upheld the circuit court's reasonable interpretation of the term without a trial. In his brief to the court of appeals, Hauser argued that the circuit court erred by concluding that the term "book value" was indefinite.

308

ties.[15] The parties disagree, however, as to which assets and liabilities should be included in the calculation and how those values should be calculated.

¶ 51. In his complaint, Ehlinger alleged that the agreement was unenforceable because, among other reasons, it did not indicate how "book value" would be computed. Over the course of several years of circuit court proceedings, the court attempted to give meaning to the term.

¶ 52. During the proceedings at the circuit court, Hauser asserted that the parties intended "book value" to refer to the value of assets minus liabilities computed on the year-end financial statements, which are calculated in order to minimize tax liability. By contrast, Ehlinger argued that "book value" refers to the value of assets minus liabilities, computed according to generally accepted accounting principles (GAAP).

¶ 53. Hauser now argues that the circuit court erred when, without holding a trial on the intent of the parties, it concluded that the term "book value" was "too vague to be cured." He asserts that the term may be ambiguous, but it is not indefinite. Therefore, he argues that a trial on the parties' intent is necessary to solve what he considers to be a contractual ambiguity.[16]

---

[15] *But see Schumann v. Samuels,* 31 Wis. 2d 373, 377, 142 N.W.2d 777 (1966). In *Schumann,* the court concluded that in the absence of a contractual definition, "book value" referred to the "*market value* of the assets of the company after deducting its liabilities." (Emphasis added.) Neither party cites to *Schumann* for this premise or appears to advance the *Schumann* definition.

[16] It should be noted that over the course of seven years, the circuit court held seven days of trial regarding the enforceability of the buyout agreement: May 9, 2005, May 10, 2005, July 26, 2005, July 27, 2005, September 7, 2005, June 26, 2006, and

¶ 54. There are two distinct questions embedded within our inquiry. First, can the parties' agreement be interpreted to give meaning to the term "book value"? Second, if it can be so interpreted, what was the dollar amount of "book value" on March 31, 2001?

¶ 55. The circuit court concluded that the term "book value" was vague and indefinite, and that the agreement was therefore unenforceable. The court of appeals rejected the circuit court's conclusion that the term was indefinite. Rather, it concluded that the term was ambiguous.

¶ 56. A contract can be ambiguous without being indefinite. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) ("An ambiguous contract is not necessarily indefinite."). A contract is ambiguous when it is "fairly susceptible of more than one construction." *Id.* at 177. If a contract term is ambiguous, extrinsic evidence may be used to help construe its meaning. *Id.*

¶ 57. By contrast, "the definiteness requirement is relevant to contract formation, not interpretation." *Id.* at 178. A contract requires mutual assent of the parties and "must be definite as to the parties' basic commitments and obligations." *Id.* Mutual assent is judged based on an objective standard, looking to the express words used in a contract. *Id.* "Vagueness or indefiniteness as to an essential term of the agreement *prevents the creation* of an enforceable contract." *Id.*

¶ 58. We have explained that "[b]ook value is a term of ambiguous meaning" when it is not further defined by a contract. *Schumann v. Samuels,* 31 Wis. 2d

August 14, 2006. Additional hearings were held on the following dates: May 7, 2002, October 19, 2005, November 17, 2005, October 31, 2006, January 17, 2007, and February 28, 2007.

373, 376, 142 N.W.2d 777 (1966). Under some circumstances, an undefined term might not only be ambiguous, but it might be indefinite as well. If a contract term is indefinite, a trial cannot cure the contract deficiency.

¶ 59. Here, however, we need not resolve whether the buyout agreement is indefinite, ambiguous, neither, or both because resolution of that question would not change the outcome of this case. If we concluded that the contract was indefinite, further fact-finding could not cure the deficiency and the agreement would not be enforced. Moreover, if we determined that the agreement was ambiguous, a trial on the parties' intentions would be a superfluous exercise due to the specific circumstances presented in this case. Because Ehlinger cannot now validate any claimed "book value," the contract cannot be enforced regardless of how the term could be defined.

¶ 60. The parties agree that Ehlinger is entitled to examine the books in order to validate that the buyout price accurately reflected Evald's book value.[17] *See Townsend v. LaCrosse Trailer Corp.*, 254 Wis. 31, 35

---

[17] In his brief, Hauser agreed that "Shareholders in a Wisconsin corporation have a statutory right to inspect and copy the accounting records of the corporation."

At oral argument, one of the justices sought to clarify Hauser's argument:

> Court: Your position is just look at the books. Look at the value of the assets on the books, look at the value of liabilities on the books, and divide it in half, right?

> Hauser's attorney: Clearly that's our position. But I do want to clarify it was never our position that Dr. Ehlinger wouldn't have the right to dig into the books to make sure that the books accurately—

> Court: Sure.

311

N.W.2d 325 (1948). This is a task that the special magistrate was unable to perform due to the state of Evald's financial records.

¶ 61. In *Townsend,* we concluded that the employee-stockholder had the "right to go behind the financial statement in order to examine all of the books, records, and files of the defendant corporation which might reflect the book value" of his stock. *Id.* at 37. In that case, a contract between an employee and his employer provided that upon the employee's termination, the corporation had the right to buy out the former employee's stocks at a price equal to one-half of their book value. We evaluated the employee's request to examine accounting records to support his argument that the corporation's financial statements did not accurately reflect the book value of the corporation.

¶ 62. The corporation argued that the employee "should be limited to an examination of the financial statement prepared by the company's auditors . . . because such statement definitely sets the book value of the stock." *Id.* at 36. We rejected the corporation's contention that a financial statement "definitely sets the book value of the stock," holding that the book value is not just any value that may be arbitrarily entered upon the books of a company. *Id.* at 37.

¶ 63. In this case if we decided that the contract was ambiguous and a trial on the meaning of "book value" was warranted, the fact-finder might accept Hauser's position that the parties intended "book value" to mean the value of assets minus liabilities calculated for tax purposes as recorded on the year-end statement. Under those circumstances, Ehlinger would be entitled to "go behind the financial statement in order to exam-

ine all of the books, records, and files" of Evald which might reflect that value. This task cannot now be performed.

¶ 64. Alternately, the fact-finder might accept Ehlinger's position that the parties intended "book value" to mean the value of assets minus liabilities, computed according to GAAP. Again, Ehlinger would be entitled to examine the books, records, and files, which cannot now be done.

¶ 65. Here, regardless of whether the parties intended assets and liabilities to be computed on a cost basis, a tax basis, a fair market value basis, or any other basis, the unavailability of Evald's financial records prevents Ehlinger from exercising his right to examine the books in order to assess the accuracy of the buyout price. From both a practical and a legal standpoint, the unavailability of the records precludes this agreement from being enforced.[18]

¶ 66. Typically, an appellate court should decide cases on the narrowest possible grounds. *State v. Blalock,* 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989). Issues that are not dispositive need not be addressed. *Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938). A court generally will not engage in an exercise which circumstances have rendered purely academic. *State ex rel. Olson v. Litscher,* 2000 WI App 61, ¶ 3, 233 Wis. 2d 685, 608 N.W.2d 425.

---

[18] We accept Hauser's contention that the destruction of some of Evald's books, records, and files was unintentional, and we draw no inference based on their absence. We do not infer that the financial statements prepared by Evald inaccurately represent the corporation's "book value" as valued on a tax basis. Conversely, we cannot make the opposite inference—that Evald's financial statements represent the actual "book value" valued on a tax basis.

¶ 67. Here, the resolution of whether the term "book value" is indefinite or ambiguous has no practical effect upon the existing controversy. We therefore need not resolve the question.[19] We conclude that, under the circumstances presented, the circuit court did not err when it determined that the buyout agreement could not be enforced.

B

¶ 68. In addition, Hauser contends that the court of appeals erred by concluding that supporting documentation is a "necessary component" of a valid GAAP computation. *See Ehlinger,* 313 Wis. 2d 718, ¶ 35. He asserts that under GAAP, a compilation does not require supporting documentation.

¶ 69. As a threshold matter, Hauser may be misconstruing the court of appeals' conclusion. It is not clear whether the court of appeals made a general statement that supporting documentation is a necessary component of a valid GAAP computation in all cases, or whether it determined only that supporting documentation was required under the facts of this case.[20]

---

[19] Contrary to Justice Roggensack's assertion, we do not assume that the parties intended Evald's March 31, 2001 balance sheet to be the basis for determining book value. Justice Roggensack's concurrence, ¶ 123. Further, we do not contend that availability of the documents that underlie Evald's balance sheet could cure any ambiguity or indefiniteness in the proposed buy-sell agreement. *Id.* We simply determine that we need not answer the question of what (if anything) the parties intended by "book value" because resolution of the question would not change the outcome of the case.

[20] The court stated, "[W]e are satisfied that the use of GAAP, rather than the use of Hauser's calculations, is the more

¶ 70. Even if Hauser correctly construes the court of appeals' conclusion, Hauser's assertion misses the mark. The question before the court is not what is required to do a *compilation* under GAAP, but what is required to determine the parties' contractual rights.

¶ 71. During the two-day trial over the corporation's book value, Hauser cross-examined the special magistrate. The special magistrate agreed that accountants perform three levels of service under GAAP: compilations, reviews, and audits.[21] He agreed that it was not necessary to verify financial statements when performing a compilation.

¶ 72. Hauser argues that, based on the circuit court's instructions, the special magistrate was required to "accept the representations of Evald Moulding, Inc. and Hauser." He asserts that in performing a compilation, the special magistrate was not permitted to express any assurance on the statements.

¶ 73. Hauser's position misconstrues the circuit court's instructions to the special magistrate. The circuit court did not ask the special magistrate to perform a compilation. Instead, it asked him to "determine Evald's March 31, 2001 book value using generally

reasonable construction of 'book value.' In addition, the supporting documentation was a necessary component of a valid GAAP computation." *Ehlinger,* 313 Wis. 2d 718, ¶ 35.

[21] As the Third Circuit explained, a compilation provides "the lowest level of assurance regarding an entity's financial statements," expressing "neither an opinion nor any level of assurance." *Otto v. Pennsylvania State Edu. Ass'n,* 330 F.3d 125, 133 (3d Cir. 2003). A review provides "limited assurance on the entity's financial statements." An audit provides "the highest level of assurance," and the accountant "provides *verification* of the financial statements' claims and assertions, and expresses an opinion on the entity's financials." *Id.*

315

accepted accounting principles which are appropriate for the size, function and structure of this corporation." The special magistrate concluded that he could not determine Evald's book value without knowing the basis from which the numbers on the corporation's financial statements were computed.

██

¶ 74. The problem with Hauser's argument is that it assumes that by "book value," the parties intended nothing more than the number taken from Evald's year-end statement. Hauser's argument is tantamount to an assertion that Ehlinger is required to accept the value listed on Evald's year-end financial statement without further inquiry. Yet we soundly rejected that argument in *Townsend. See supra,* ¶¶ 61–62. Although a corporation may keep its books within the confines of the law and as it sees fit,[22] the company's financial statements do not "definitely set[] the book value of the stock." *Townsend,* 254 Wis. at 36.

## C

¶ 75. Finally, Hauser contends that the circuit court erroneously denied his motion to depose and fully cross-examine the special magistrate and to present an expert witness in rebuttal. He asserts that the special magistrate was appointed not as a referee under Wis. Stat. § 805.06, but rather as a court-appointed expert under Wis. Stat. § 907.06. As such, Hauser argues that the court erred by preventing him from using all of the

---

[22] By these determinations, we do not require accountants to use GAAP instead of tax accounting principles when keeping their client's books. Instead, we simply reaffirm our prior case law regarding the determination of a corporation's book value in a shareholder dispute.

tools of the adversary system to challenge and counter the special magistrate's conclusions.

¶ 76. The Wisconsin statutes authorize a court to appoint a referee to determine "matters of account" and other complicated issues.[23] "The role of a referee is to help the court in cases where the expertise of the referee is needed" to assist the court in obtaining facts and arriving at a correct result in complicated litigation. Patricia Graczyk, *The New Wisconsin Rules of Civil Procedure Chapters 805–807*, 59 Marq. L. Rev. 671, 683–84 (1976).

¶ 77. The procedure for appointing a referee in Wisconsin is similar to the procedure for appointing a master under the Federal Rules of Civil Procedure, Rule 53. The court order appointing a referee and describing the referee's powers is called a "reference." If a party wishes to contest the reference, it should move the court to revoke the reference. 3A Jay E. Grenig, *Wisconsin Practice Series: Civil Procedure* 35 (3d ed. 2003) (citing *La Buy v. Howes Leather Co.*, 352 U.S. 249 (1957)).

¶ 78. Section 805.06(3) provides a circuit court with broad discretion in crafting the reference. Although a referee is generally permitted to conduct hearings and subpoena witnesses, the reference may specify or limit the referee's powers. It may direct the referee to "receive and report evidence only." Wis. Stat. § 805.06(3); *see also* Grenig, *supra,* at 36 ("The order may direct the referee to report only upon particular issues, to do or perform particular acts, or to receive and report evidence only.").

---

[23] "A reference shall be the exception and not the rule. . . . [I]n actions to be tried without a jury, *save in matters of account* and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it." Wis. Stat. § 805.06(2) (emphasis added).

317

¶ 79. The referee must file his or her report with the clerk of court. Wis. Stat. § 805.06(5)(a). Parties may object to the referee's report within 10 days of filing. Upon objection and after a hearing, the court is permitted to adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit it with instructions. Wis. Stat. § 805.06(5)(b).

¶ 80. Wisconsin statutes also permit a court to appoint an expert witness. *See* Wis. Stat. § 907.06. When the court appoints an expert witness, the parties may take the expert's deposition and the expert can be called as a witness by either the court or a party. Hauser contends that because the referee did not conduct hearings or file his report with the court, he was an expert witness, subject to discovery and full cross-examination.

¶ 81. The court did not cite to either the referee statute or the court-appointed expert witness statute when it appointed the special magistrate and instructed him to determine the book value of Evald. Nevertheless, it is apparent from the record that at the time of appointment, the parties and the court understood the role of the special magistrate to be analogous to a referee or a master. Computation of Evald's book value was a "matter[] of account" that had proved to be a complicated issue which the parties had disputed over the course of several years. It appears that the court determined that it required the expertise of the special magistrate to help the court obtain facts and arrive at a correct result.

¶ 82. In its order appointing the special magistrate, the court specified the magistrate's role as follows: he "will determine Evald's March 31, 2001 book value," "will advise the Court of any departures from GAAP," and "will report any substantial inconsistencies"

in Evald's books. During a hearing, the court clarified that the special magistrate was to receive and report evidence only. The court stated: "[Y]ou're required to answer inquiries of the Special Magistrate, but I don't want any advocacy." Further, the court prohibited ex parte conversations.

¶ 83. Hauser agreed to the procedure outlined by the court. During a hearing, his attorney stated:

> I think what the Court's saying is that Mr. Chmielewski is going to look at these things; he's going to say: . . . in these accounting situations is this good accounting or not? Is this reasonable, accurate accounting or not? If that's the way he's going to do it, I got no problem with that.

It was only after the special magistrate's report was complete and he concluded that he was unable to verify Evald's assets and liabilities that Hauser first objected to the proceedings. The record does not evince an understanding by the parties that the special magistrate was appointed as an expert witness.

¶ 84. The court first discussed the special magistrate's appointment at a hearing held on October 19, 2005. Over the course of the following nine months, the special magistrate investigated Evald's books, communicated with the parties, and prepared drafts of his report.

¶ 85. Neither party asserted a right to cross-examine the special magistrate until June 27, 2006, two days before trial. At that point, Hauser first asserted that the special magistrate was an expert witness subject to cross-examination. The circuit court permitted a limited cross-examination of the special magistrate, but it clarified that "[h]e's not anybody's expert witness."

¶ 86. Further, neither party requested an opportunity to depose the special magistrate or present rebuttal expert testimony until after the trial had already commenced. Toward the end of the first day[24] and in response to an objection by opposing counsel, Hauser's attorney first suggested that he should be entitled to depose the special magistrate and present his own expert witness.

■

¶ 87. Under these circumstances, Hauser forfeited his right to object to the procedures specified by the court in the reference. *See State v. Ndina*, 2009 WI 21, ¶¶ 29–30, 315 Wis. 2d 653, 761 N.W.2d 612. We conclude that the circuit court did not erroneously exercise its discretion when it denied Hauser the opportunity to subject the special magistrate to a broader scope of cross-examination, to depose the special magistrate, and to present his own expert witness in rebuttal.

¶ 88. At oral argument, both parties expressed admiration for the circuit court's persistent and pragmatic attempts to resolve this complicated litigation. Nevertheless, Hauser points to certain procedural irregularities at the circuit court. For instance, although the special magistrate submitted his report to the court and the clerk of courts provided the report to the parties, there is no indication that the clerk of courts filed the report in the circuit court record.[25] *See* Wis. Stat. § 805.06(5)(a). Further, during Ehlinger's cross-

---

[24] It appears that the parties and the court expected the trial to last only one day and for the court to issue a final judgment based on the court's decision. In fact, due to unresolved questions that emerged during the trial, the court was required to schedule a second day.

[25] Justice Ziegler's concurrence/dissent asserts that the parties could not have been clear about their opportunity to

examination of the special magistrate, he asked the magistrate about his opinions "to a reasonable degree of accounting certainty"—a phrase generally reserved for expert witnesses.

¶ 89. Because referee appointments are an exceptional procedure,[26] the court, the parties, and the referee will often be unfamiliar with the process. It would have been better had the reference more clearly defined the special magistrate's powers and responsibilities. A reference should clearly delineate the court's expectations regarding the types of evidence the referee should examine and the form of the report, including whether the referee should make findings of fact and conclusions of law. Explicit parameters that are enu-

object to the special magistrate's report. *See* Justice Ziegler's concurrence/dissent, ¶ 207. Such an assertion is a misread of the record.

The record reveals that the clerk of court provided the special magistrate's report to the parties at some time prior to June 1, 2006—at least 29 days before the June 29 trial. The record also reveals that Hauser exercised his opportunity to object.

Hauser first objected to the report by letter on June 6. He asserted that the report inaccurately stated that Evald was an S-Corporation rather than a C-Corporation, and that the report failed to account for a calculation of an accrual for deferred income taxes. The special magistrate adjusted his report to reflect that Evald was a C-Corporation.

The June 29 trial was scheduled as a one-day trial. At trial, Hauser again objected to the report, asserting that the special magistrate had failed to consider certain financial documents. The court adjourned the trial so that the special magistrate could consider these documents. However, the special magistrate indicated that the documents did not alter his conclusion that he was unable to determine the book value of Evald.

[26] See Wis. Stat. § 805.06(1).

merated in a reference will help clarify the procedures and keep the court, the parties, and the referee on track.

¶ 90. Nevertheless, on this record we are satisfied that at the time the order appointing the special magistrate was issued, the court and the parties contemplated that the special magistrate would fulfill the role of a referee. We are also satisfied that the parties were given a full opportunity to object to the special magistrate's factual determinations. We therefore conclude that the circuit court's exercise of discretion was not erroneous.

## IV

¶ 91. We turn next to Ehlinger's cross-petition for review, which presents an issue of first impression in Wisconsin. Ehlinger argues this is primarily a dispute between shareholders and it was improper for Hauser's litigation expenses to be paid from the corporate till.

¶ 92. Both Hauser and Evald are named parties in this dispute. During the proceedings in circuit court, Ehlinger learned that Hauser was directing the corporation to pay for the defendants' litigation expenses. On four occasions, Ehlinger asked the circuit court to enjoin Hauser from paying for the litigation with corporate funds.

¶ 93. In addressing Ehlinger's concern, the circuit court opined that it presented a close call. Without further discussion, the court concluded that the corporation had an interest and that is was more than a nominal party in the litigation:

> I think that the prospective attorney fee sourcing is a closer issue. But it seems to me that the Corporation is more than a nominal party; it does have an interest

> here and, seems to me, would be impossible for the Court as we sit here today to ascertain prospectively how to assign any attorney's fees.

Accordingly, it denied Ehlinger's motion.

¶ 94. Ehlinger contends that this action is primarily a dispute between two shareholders, and that the corporation is only a party to the action so that the court has jurisdiction to order its dissolution. Thus, he argues that it was improper for the defendants' litigation expenses to be paid from the corporate till.

¶ 95. Under these circumstances, it would be appropriate for the corporation to fund the lawsuit if either Evald indemnified Hauser for actions he took in his capacity as a corporate officer or the corporation spent its funds in its own defense. We address these arguments in turn.

¶ 96. In his brief to this court, Hauser contended that he had been indemnified by the corporation for expenses incurred on his behalf as a corporate officer. Wis. Stat. § 180.0851(1) and (2) require indemnification of an officer under certain circumstances when the officer "was a party because he or she is a director or officer of the corporation."

¶ 97. Under the statute, however, indemnification is not self-executing. Rather, certain formalities are required. There is a good policy reason for these formalities. They prevent after-the-fact justification for taking corporate funds for personal use. Without these formalities, an officer could direct the corporation to pay funds for his own defense and only later assert that he had been indemnified by the corporation.

¶ 98. "A director or officer who seeks indemnification under [180.0851] shall make a written request to the corporation." Wis. Stat. § 180.0851(3). Further, if

■■■■

■■■■

the officer wants the corporation to pay the expenses in advance of a final disposition, the officer must provide the corporation with "[a] written affirmation of his or her good faith belief that he or she has not breached or failed to perform his or her duties to the corporation" as well as "[a] written undertaking, executed personally or on his or her behalf, to repay the allowance" if it is later determined that indemnification is not required. Wis. Stat. § 180.0853.

¶ 99. An officer who is "successful on the merits or otherwise" is entitled to indemnification under section 180.0851(1).[27] An officer who was not successful may still be entitled to indemnification under sub. (2), but there must be a "determination of whether indemnification is required." Wis. Stat. § 180.0851(2)(b). Section 180.0855 prescribes six procedures by which the determination that a director is entitled to indemnification can be made.[28]

---

[27] Wis. Stat. § 180.0851(1) provides that "[a] corporation shall indemnify a director or officer, to the extent that he or she has been successful on the merits or otherwise in the defense of a proceeding, for all reasonable expenses incurred in the proceeding . . . ." Hauser does not assert that he is entitled to indemnification under sub. (1), likely because he has not been successful in the defense of this proceeding and did not follow the procedural requirements in section 180.0851(3) and section 180.0853.

[28] Section 180.0855 provides that the director seeking indemnification shall select one of the following six means for determining the right to indemnification: (1) a majority vote of a quorum of disinterested directors; (2) independent legal counsel; (3) a panel of three arbitrators; (4) an affirmative vote of the shares (but not the shares of any shareholder interested in the litigation); (5) court order under § 180.0854; or (6) any other method provided for in any additional right (not applicable here).

¶ 100. Given the deadlock of the board of directors in this case, the only viable option would have been a court order. Section 180.0854(1) provides that "a director or officer who is a party to a proceeding may apply for indemnification to the court conducting the proceeding or to another court of competent jurisdiction." The court "shall order indemnification" if it determines that the director is entitled to indemnification under the statute or that the officer is fairly and reasonably entitled to indemnification in view of all the relevant circumstances. *Id.* § 180.0854(2).

¶ 101. In his brief in this court, Hauser contended that the circuit court ordered his indemnification under Wis. Stat. § 180.0854(1). The record does not support this assertion.

¶ 102. Hauser did not follow any of the formalities described above. There is no indication in the record that Hauser made a written request to Evald for indemnification as required by section 180.0851(3). Further, there is no indication that he provided a written affirmation of his good faith belief and a written undertaking to repay the allowance if necessary as required by section 180.0853. Finally, there is no indication that he applied to the court for indemnification under section 180.0854.[29] Rather, it appears that he simply directed the corporation to pay all legal expenditures for the pending lawsuit.

---

[29] The court of appeals mistakenly concluded that "the circuit court did in fact order that Hauser be indemnified." *Ehlinger,* 313 Wis. 2d 718, ¶ 48. In fact, there is no indication that Hauser ever applied to the court for indemnification, and there is no order for indemnification in the record.

Justice Prosser suggests that by failing to rule on Ehlinger's motions to enjoin the corporation from paying the litigation expenses, the circuit court exercised its discretion to order

■

¶ 103. We need not determine here whether Hauser could have been indemnified by court order had he followed the statutory procedure. Rather, we simply observe that Hauser did not follow that procedure and was therefore not entitled to indemnification by Evald.

¶ 104. At oral argument, Hauser abandoned the assertion that he had been indemnified and instead argued that under these circumstances, he could have been indemnified. When his attorney was asked to pinpoint the order for indemnification, he responded that he could not:

> Well, let me bury this indemnification issue. I don't think it was ever asked for, and frankly I don't think the trial court ever explicitly ordered it. I think the court of appeals was essentially saying that the trial court could have done so and perhaps impliedly did so when it denied all of Dr. Ehlinger's motions.

¶ 105. Having abandoned the argument that he was indemnified by Evald, Hauser now rests exclusively on the assertion that the litigation expenses were incurred in defense of the corporation. He notes that Evald is a named party, and he asserts that Evald could retain counsel to represent its own interest in a dissolution proceeding.

---

Hauser's indemnification. *See* Justice Prosser's concurrence/dissent, ¶ 193. This assertion is incorrect for two reasons.

First, the statute does not authorize indemnification by default. A court's failure to rule on a motion cannot be the functional equivalent of ordering indemnification. Second, when the court finally denied Ehlinger's motion for an injunction in February of 2007, the court did not cite or discuss statutory indemnification at all. *See supra,* ¶ 93. Accordingly, the circuit court did not "exercise its discretion" on the subject of indemnification. *Cf.* Justice Prosser's concurrence/dissent ¶¶ 193–194.

¶ 106. Hauser cites to *Petition of Levitt,* 492 N.Y.S.2d 736 (N.Y. App. Div. 1985), as authority for his argument. That case, however, tends to undermine his argument. The *Levitt* court clearly states that "in the usual dissolution proceeding, . . . the corporation appears as a nominal party and the proceeding amounts to a dispute between the shareholders[.]" *Id.* at 742. The corporation appears as a party "for the limited and passive purpose of rendering it amenable to the orders of the court." *Id.* (citing *Matter of Clemente Bros.,* 239 N.Y.S.2d 703 (N.Y. App. Div. 1963)).

¶ 107. The *Levitt* court acknowledged that there are exceptions to this general rule:

> [T]here appears to be merit to [the non-dissenting stockholder] Toohey's claim that, inasmuch as he had already exercised his buy-out option under [New York law], all that remains is a determination of the fair value of the [other shareholder's] stock, and once that is made, he will be the beneficial owner of all the corporate stock. Therefore, it may be found that, as to the period after Toohey's exercise of the buy-out option . . . , there was no impropriety in his use of corporate funds to pay his own legal expenses. Corporate funds could not, however, be properly used to pay his counsel fees incurred prior to that election.

*Id.*

¶ 108. In this case, the question at the core of the parties' dispute was whether Hauser was entitled to invoke the disability buyout agreement and thus become the "beneficial owner of all the corporate stock." The circuit court concluded that he was not. As such, this case does not fit under the exception enumerated in *Petition of Levitt.* Rather, this is "the usual dissolution

proceeding," which "amounts to a dispute between the shareholders."[30]

¶ 109. We acknowledge that under some circumstances, a corporation can and does retain counsel for its own defense in a dissolution proceeding. In *Esposito v. Riverside Sand & Gravel Co.*, 191 N.E. 363 (Mass. 1934), the defendant caused the corporation to retain counsel to resist dissolution and directed the payment of corporate funds for the litigation expenses. The court concluded that these actions were reasonable:

> [T]he corporation was attacked; [] both a temporary and a permanent receiver for the corporation was prayed for in the bill; and [] there was a prayer for the liquidation of the assets of the corporation. . . . the practical danger to the corporation cannot be pronounced so negligible that it could well have ignored the plaintiff's suit as the plaintiff now contends. The corporation was not a mere nominal defendant.

*Id.* at 364.

■

¶ 110. We have repeatedly stressed, however, that the interests of shareholders and the corporation are not always the same. *See, e.g., Button v. Hoffman*, 61 Wis. 20, 20 N.W. 667 (1884); *Milwaukee Toy Co. v. Industrial Commission*, 203 Wis. 493, 234 N.W. 748

---

[30] *See also Reinschreiber v. Lipp*, 416 N.Y.S.2d 31 (N.Y. App. Div. 1979) (concluding that "[t]he trial court abused its discretion in directing that the funds of the corporations be used to reimburse the [shareholder resisting dissolution] for the cost of attorney's fees incurred in defending the dissolution proceedings."); *Application of Cantelmo*, 104 N.Y.S.2d 282 (N.Y. App. Div. 1951) ("In the dissolution proceeding of the corporation [which had two 50 percent shareholders,] the court had no power to fix the fees of attorneys who were retained by [one of the shareholders] to resist the dissolution.")

(1931). Additionally, the corporation may not assume a "militant alignment on the side of one of two equal, discordant stockholders." *Matter of Clemente Bros.*, 239 N.Y.S.2d at 706. In this case, Evald does not have an interest in whether Ehlinger remains a shareholder.

¶ 111. Here, only one answer, signed by Attorney Ahrens, was filed in response to the complaint. Throughout the proceedings and in the court filings, Attorney Ahrens repeatedly signed on the defendants' behalf.[31] The singularity of Attorney Ahrens' representation is indicia that only one interest is being represented— that of Hauser, one of the two equal, discordant shareholders.

¶ 112. A review of the record underscores the conclusion that this is a dispute between shareholders and Evald is merely a nominal party. In his complaint, Ehlinger asked the court to enter a judgment declaring that Hauser "has no present right . . . to require plaintiff to tender his shares of Evald Moulding, Inc. for redemption by that corporation." He sought judicial dissolution of the corporation because "[t]he shareholders of Evald are deadlocked in voting power."

[31] For instance, Attorney Ahrens was the only counsel to sign the following documents on behalf of the defendants: Defendants' Motion to Dismiss Pursuant to Wis. Stat. § 805.17(1) (filed August 29, 2005), Defendant's [sic] Motion for Partial Reconsideration of September 9, 2005 Ruling Regarding Particularization and Trial of Any Claim by Plaintiff of Waste By Defendants (filed September 9, 2005); Notice of Motion and Motion in Limine (filed January 27, 2006); Stipulation and Order (stipulating to the entry of exhibits for the 2005 trial, filed June 21, 2006); Notice of Motion and Motion for Reconsideration and for an Order Setting for Trial the Issue of the Ambiguity of the Term Book Value in the Buy/Sell Agreement and Whether Defendant's [sic] Substantially Performed (filed December 11, 2006); Notice of Appeal (filed April 25, 2007).

¶ 113. Ehlinger clarified that "Evald is named as a defendant because plaintiff seeks judicial dissolution of Evald because of impasse and because of the actions of defendant Hauser." Under these facts, the corporation was not made a defendant in any way related to the corporation's actions towards Ehlinger. Rather, it is Hauser's actions that form the basis of the complaint.

¶ 114. We have concluded that Hauser was not entitled to indemnification according to the provisions of Wis. Stat. § 180.0855. We further determine that Evald may not militantly align itself on the side of Hauser, one of two equal, discordant shareholders, by paying for expenses incurred by Hauser in defense of his actions as a shareholder.

¶ 115. Here, although the court concluded that Evald had an interest in the dispute, it did not define that interest or apply the relevant law. Therefore, we conclude that the circuit court erroneously exercised its discretion by failing to enjoin Hauser from charging the litigation expenses to the corporation. *See State v. Delgado*, 223 Wis. 2d 270, 281, 588 N.W.2d 1 (1999).

V

¶ 116. In sum, we conclude that the circuit court did not err when it determined that the agreement was unenforceable. Both parties agree that Ehlinger is entitled to examine Evald's books to determine whether they accurately reflect the corporation's assets and liabilities, a task that the special magistrate was unable to perform due to the state of Evald's records. Accordingly, we need not resolve whether the contract is indefinite or ambiguous here because under these circumstances, it cannot be enforced.

¶ 117. Further, to the extent that Hauser's characterization of the court of appeals' decision is accurate,

we determine that his argument about the scope of GAAP fails. The question is not what is required under GAAP, but what is required to determine the parties' rights.

¶ 118. We also conclude that the circuit court did not erroneously exercise its discretion when it denied Hauser the opportunity to subject the special magistrate to a broader scope of cross-examination, to depose the special magistrate, and to present his own expert witness in rebuttal.

¶ 119. Finally, we conclude that the circuit court erroneously exercised its discretion when it permitted the corporation to pay Hauser's litigation expenses. We determine that Hauser was not entitled to indemnification by Evald according to the provisions of Wis. Stat. § 180.0855. Further, under these facts, the litigation expenses were not incurred by the corporation for its own defense.

¶ 120. Accordingly, we affirm the court of appeals as modified in this opinion and remand to the circuit court for the appointment of a receiver.

*By the Court.*—The decision of the court of appeals is modified and affirmed and, as modified, the cause is remanded.

¶ 121. N. PATRICK CROOKS, J., did not participate.

¶ 122. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). I write in concurrence because I conclude that William Ehlinger (Ehlinger) and Jon Hauser (Hauser) had no binding buy-sell agreement in regard to valuing a shareholder's interest in Evald Moulding, Inc. (Evald). The proposed buy-sell agreement is irretrievably indefinite in that it does not define an essential term of the proposed agreement, i.e., on what basis Evald's assets and liabilities are to be valued in calcu-

lating book value. Accordingly, I conclude that the proposed buy-sell agreement is unenforceable.

¶ 123. I also write in concurrence because I conclude that the majority's theory that the proposed buy-sell agreement is unenforceable due to Hauser's failure to preserve sufficient corporate records to verify Evald's March 31, 2001 balance sheet rests on three unspoken assumptions, with which I am not in agreement. The first assumption is that the proposed buy-sell agreement between Ehlinger and Hauser intended Evald's March 31, 2001 balance sheet to be the basis for determining book value no matter on what basis that balance sheet's assets and liabilities were valued. The second assumption is that Hauser had an obligation to maintain documents sufficient to verify Evald's March 31, 2001 balance sheet. The third assumption is that having the documents that underlie Evald's March 31, 2001 balance sheet will cure any ambiguity or indefiniteness in the proposed buy-sell agreement. None of those assumptions is warranted. Accordingly, for the reasons set forth below, I respectfully concur.

## I. BACKGROUND

¶ 124. The lengthy history of this case is ably set out in the majority opinion and need not be repeated here. Suffice it to say that on June 20, 2001, Hauser invoked the disability buyout provision of the proposed buy-sell agreement based on Ehlinger's disability. Because that agreement used the term "book value" as the measure for determining a shareholder's interest in Evald, Hauser calculated what he asserted was the book value of Evald at the relevant time, the end of Evald's fiscal year, March 31, 2001. Hauser offered Ehlinger $431,400 to purchase his stock in Evald.

¶ 125. Ehlinger agreed that Evald's book value was the measure for ascertaining the value of his stock, but he concluded that book value had been understated. Therefore, he refused Hauser's offer.

¶ 126. Ehlinger also asked that Evald's financial records be audited and the book value be determined based on that audit. Hauser refused, and because Hauser and Ehlinger are equal shareholders, no audit was done.

¶ 127. In the lawsuit that is now before us, Ehlinger asserted that Hauser had calculated book value on a tax basis, that the accounts receivable were undervalued and that all of the liabilities listed on the March 31, 2001 balance sheet were not valid obligations of Evald. Therefore, he asserted that the March 31, 2001 balance sheet could not be used to determine the true book value of Evald. He also asserted that he had not been provided with sufficient supporting documentation to fully review Hauser's determination of book value.

¶ 128. The circuit court appointed a special magistrate to determine whether book value could be calculated. However, the special magistrate concluded that he could not verify Evald's book value at fiscal year end because of the lack of supporting documentation. He explained that he could not verify Evald's physical inventory, accounts receivable and accounts payable, all of which were material to a determination of book value.

¶ 129. Thereafter, the circuit court determined that the proposed buy-sell agreement was hopelessly indefinite and therefore, unenforceable. Hauser appealed. After concluding that the proposed buy-sell agreement was ambiguous, not indefinite, the court of appeals affirmed the circuit court. *Ehlinger v. Hauser &*

*Evald Moulding, Inc.,* 2008 WI App 123, ¶ 31, 313 Wis. 2d 718, 758 N.W.2d 476.

¶ 130. The majority opinion concludes that the lack of documentation to verify the March 31, 2001 balance sheet makes it unnecessary to determine whether the circuit court was correct in determining that the proposed buy-sell agreement was indefinite or the court of appeals was correct in determining that the proposed agreement was ambiguous.[1]

## II. DISCUSSION

### A. Standard of Review

¶ 131. Whether an agreement[2] is ambiguous is a question of law for our independent review. *Moran v. Shern,* 60 Wis. 2d 39, 46–47, 208 N.W.2d 348 (1973); *Town of Neenah Sanitary Dist. No. 2 v. City of Neenah,* 2002 WI App 155, ¶ 9, 256 Wis. 2d 296, 647 N.W.2d 913. We also decide as a question of law whether a proposed agreement is indefinite. *See Gerruth Realty Co. v. Pire,* 17 Wis. 2d 89, 94–95, 115 N.W.2d 557 (1962).

### B. General Contract Principles

¶ 132. An agreement is ambiguous if it is capable of more than one reasonable interpretation. *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). An agreement is indefinite when an essential term of the agreement is so uncertain as to prevent the creation of an enforceable contract. *Id.* at 178. Determining that a

---

[1] Majority op., ¶ 59.

[2] I use agreement and contract interchangeably in this concurrence.

contract is ambiguous or that it is indefinite has different consequences for the parties to a proposed contract.

¶ 133. If an alleged agreement is ambiguous, the law presumes that a binding contract has been made and a fact question arises as to what the parties meant by the ambiguous term at the time the agreement was made. *Bank of Sun Prairie v. Opstein,* 86 Wis. 2d 669, 674–76, 273 N.W.2d 279 (1979); *Lemke v. Larsen Co.,* 35 Wis. 2d 427, 431–32, 151 N.W.2d 17 (1967). Additionally, when an agreement is ambiguous, the meaning of the agreement is not determined solely by the face of the agreement; extraneous evidence of the intent of the parties may also be considered. *Patti v. W. Mach. Co.,* 72 Wis. 2d 348, 351, 241 N.W.2d 158 (1976). The parties to the agreement may testify about what they intended the ambiguous term to mean when they entered into the contract. *Id.* at 354–55. The trier-of-fact will then determine what the parties intended. *Id.*

¶ 134. On the other hand, if an alleged agreement is indefinite as to an essential term, no enforceable agreement has been made because the parties have not agreed to their particularized obligations. *Shetney v. Shetney,* 49 Wis. 2d 26, 38, 181 N.W.2d 516 (1970); 1 *Corbin on Contracts* § 95, at 394 (1963). The requirement that a contract's essential terms be definite stems from requiring mutual assent, or a "meeting of the minds," to create an enforceable agreement. 1 *Corbin on Contracts* § 4.13, at 634–37 (rev. ed. 1993).

¶ 135. As we have explained, an indefinite agreement is no agreement at all. *Gerruth Realty,* 17 Wis. 2d at 93. Stated otherwise, "the definiteness requirement is relevant to contract formation, not [contract] interpretation." *Mgmt. Computer Servs.,* 206 Wis. 2d at 178.

¶ 136. An enforceable agreement is not created when an essential term is indefinite. *Id.* An essential

term is definite when there is mutual assent as to its meaning by the parties to the agreement. *Id.* An objective standard is used to determine whether there has been mutual assent. *Id.* If an essential term of an agreement is indefinite, it renders the contract unenforceable and our analysis of the alleged agreement ends with that determination.

## C. Proposed Buy-Sell Agreement

¶ 137. The circuit court held extensive hearings on the meaning of book value. At their conclusion, the court found that " '[b]ook value' could mean anything from simple adoption of the year end statement to an audited determination." *Memorandum Decision* 1 (Jefferson County Cir. Ct. Nov. 29, 2006). It also found that "[t]he parties' conduct is insufficient to give definite meaning to the vague term." *Id.* at 2. The circuit court then concluded that it must "grant[] Plaintiff's motion to declare 'book value' undeterminable." *Id.*

¶ 138. On review, we sustain a circuit court's findings of fact unless they are clearly erroneous. *Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2009 WI 74, ¶ 34, 319 Wis. 2d 1, 768 N.W.2d 615 (citing *Steinbach v. Green Lake Sanitary Dist.*, 2006 WI 63, ¶ 10, 291 Wis. 2d 11, 715 N.W.2d 195). Whether an alleged contract is indefinite can be determined by the trier-of-fact or as a matter of law. *Mgmt. Computer Servs.*, 206 Wis. 2d at 178. Here, according to the findings and conclusions of the circuit court, the indefiniteness of book value could not be made more certain by surrounding circumstances. *See Gerruth Realty*, 17 Wis. 2d at 92.

¶ 139. I conclude that the circuit court's findings are not clearly erroneous and that the proposed buy-sell agreement is incurably indefinite. First, there is noth-

ing in the record from which to ascertain the basis upon which the parties decided that book value was to be calculated, when the proposed agreement was signed.[3] Yet, that is the relevant timeframe for establishing the meaning of book value. *See Bank of Sun Prairie,* 86 Wis. 2d at 674–76.

¶ 140. Second, while book value is generally accepted as the assets of a corporation less its liabilities, there is no universal method by which a corporation values its assets and liabilities. For example, assets could be valued on a cost basis, a tax basis, a fair market value basis or some other basis. The proposed buy-sell agreement is silent about valuation of Evald's assets and liabilities for purposes of a shareholder buyout. Book value, with no further instructions about what is to be included and on what basis valuation is to be made, is too amorphous a term to provide the definiteness necessary to create an enforceable agreement.

¶ 141. For example, in *Gardner v. Gardner,* 190 Wis. 2d 216, 527 N.W.2d 701 (Ct. App. 1994), the court of appeals upheld a settlement agreement because the wife was informed by separate counsel that there was a difference between book value and the fair market value of certain stock. *Id.* at 230–31. Therefore, she could not complain that her husband had not adequately disclosed a major asset in the estate, which was listed as book value. *Id.* In *Wisconsin Department of Revenue v. River City Refuse Removal, Inc.,* 2007 WI 27, 299 Wis. 2d 561, 729 N.W.2d 396, we described a computation of book value as "subtracting the accumulated depreciation" from "the original purchase price" of assets, during a transfer of assets between a subsidiary and a parent company. *Id.,* ¶ 8.

---

[3] The proposed buy-sell agreement was signed on August 14, 1992.

¶ 142. In *Schumann v. Samuels,* 31 Wis. 2d 373, 142 N.W.2d 777 (1966), the parties had a partnership agreement that addressed buyouts upon retirement. In regard to valuation, that agreement provided:

> "[B]ooks shall be kept on . . . a cash receipts and disbursements method of accounting, with use of inventories. However, this result is to be achieved by making the daily entries on the accrual system and adjusting them on any valuation date to the cash receipts and disbursements method, with use of inventories."

*Id.* at 374.

¶ 143. Schumann decided to retire, and Samuels elected to purchase his interest under the above quoted provision of the partnership agreement. *Id.* at 375. We concluded that even though both parties agreed that Schumann's interest could be purchased for book value, the agreement was nevertheless unenforceable. *Id.* at 376–77. As we explained, "[t]here is no doubt that 'book value' can be almost anything that the parties to a contract clearly define it to be." *Id.* We then remarked that in *Townsend v. La Crosse Trailer Corp.,* 254 Wis. 31, 35 N.W.2d 325 (1948), we said that book value was " 'the market value of the assets' " less the company's liabilities. *Schumann,* 31 Wis. 2d at 377 (quoting *Townsend,* 254 Wis. at 36). We then imposed *Townsend*'s determination of book value on the parties. *Id.*

¶ 144. While we may have reached the correct result for the parties in *Schumann,* we cannot apply its reasoning here because *Townsend* did not decide that book value equaled "market value" of assets less the company's liabilities. Rather, *Townsend* was a discovery case in a pre-complaint filing posture where the plaintiff wanted to view a list of documents to determine whether he could file a complaint alleging that the balance sheet

provided to him was fraudulently constructed. *Townsend*, 254 Wis. at 36–37. Suffice it to say that the definitions ascribed to book value and the methods used in calculating book value vary considerably from case to case.

¶ 145. Third, Hauser does not contend that the circuit court's finding, that book value under the buy-sell agreement could mean anything from simple adoption of a year end statement to an audited determination, is clearly erroneous. Instead, he argues that the circuit court "incorrectly diagnosed the problem as indefiniteness instead of ambiguity." Hauser's brief in chief, 17. The findings of the circuit court cannot be set aside by simply contending that the legal issue is whether the proposed agreement is ambiguous rather than indefinite.

¶ 146. I conclude that the proposed agreement is indefinite as a matter of law, irrespective of whether that conclusion is based on the circuit court's findings of fact or is simply derived from the face of the agreement. The circuit court's findings of fact are not clearly erroneous, and there is no explanation in the proposed agreement from which one can objectively determine the basis on which Evald's assets and liabilities are to be valued when calculating book value. Accordingly, I would affirm the court of appeals' affirmance of the circuit court, albeit on a different basis.

### D. The Majority Opinion

¶ 147. The majority opinion concludes that it is not necessary to determine whether the proposed buy-sell agreement is ambiguous or indefinite.[4] The majority opinion asserts:

---

[4] Majority op., ¶ 3.

Because Ehlinger cannot now validate any claimed "book value," the contract cannot be enforced regardless of how the term could be defined.[5]

¶ 148. The majority opinion concludes that Ehlinger had the right to inspect the documentation underlying the March 31, 2001 balance sheet.[6] Based on this conclusion, the majority opinion then assumes, without so stating, that Hauser had an obligation to maintain documentation sufficient to verify the figures on Evald's balance sheet. Such an obligation could arise by contract for Hauser or perhaps by statute, if Evald had the obligation. *See Kasten v. Doral Dental USA, LLC,* 2007 WI 76, ¶ 5, 301 Wis. 2d 598, 733 N.W.2d 300. However, no party testified to an agreement that Hauser would permanently maintain supporting documentation for Evald's balance sheets and the proposed buy-sell agreement contains no such obligation.

¶ 149. Furthermore, no statute requires Evald to permanently maintain supporting documentation for its balance sheets.[7] Wisconsin's business corporation law is contained in ch. 180. Wisconsin Stat. § 180.1602 addresses the inspection of corporate records by a shareholder. A shareholder who qualifies for the right to inspect corporate records under § 180.1602(2)(b)[8] has a statutory right to inspect the corporation's bylaws under § 180.1602(1m) and three additional categories

---

[5] *Id.,* ¶ 59.

[6] *Id.,* ¶¶ 3, 60.

[7] It is important to point out that no four justices agree that Hauser or Evald had an obligation to retain supporting documentation for Evald's balance sheets.

[8] There is no question that Ehlinger is a shareholder who qualifies for the statutory right to inspect the three categories of records listed in Wis. Stat. § 180.1602(2)(a).

of records pursuant to § 180.1602(2)(a). Those categories of corporate records are:

> 1. Excerpts from any minutes or records that the corporation is required to keep as permanent records under s. 180.1601(1).[9]

> 2. Accounting records of the corporation.

> 3. The record of shareholders, except as provided in s. 180.1603(3).

§ 180.1602(2)(a). In regard to "accounting records" of a corporation, Wis. Stat. § 180.1601(2) provides that a "corporation shall maintain appropriate accounting records." However, nowhere in ch. 180 are "appropriate accounting records" defined.

¶ 150. In addition, there is no requirement that a corporation *permanently* maintain accounting records. Wisconsin Stat. § 180.1601(1) identifies those records that must be maintained permanently.[10] The listing in § 180.1601(1) includes minutes, actions taken without a meeting and committee actions taken on behalf of the corporation. Accounting records are not among those corporate records that are required to be maintained permanently.

---

[9] Wisconsin Stat. § 180.1601(1) provides:

(1) A corporation shall keep as permanent records any of the following that has been prepared:

(a) Minutes of meetings of its shareholders and board of directors.

(b) Records of actions taken by the shareholders or board of directors without a meeting.

(c) Records of actions taken by a committee of the board of directors in place of the board of directors and on behalf of the corporation.

[10] *See supra* note 9.

¶ 151. Chapter 180, Wisconsin's current business corporation law, was created by 1989 Wis. Act 303, § 13. The type of accounting records for which ch. 180 provides a shareholder's right of inspection has received little judicial scrutiny. However, prior to the enactment of 1989 Wis. Act 303, Wis. Stat. § 180.43(1) (1987–88) was the predecessor of Wis. Stat. § 180.1602(2). Section 180.43(1) (1987–88) provided in relevant part:

> Each corporation shall keep correct and complete books and records of account and . . . minutes of the proceedings of its shareholders and board of directors . . . [and] a record of its shareholders . . . .

¶ 152. The court of appeals interpreted Wis. Stat. § 180.43(1)[11] in *Bitters v. Milcut, Inc.,* 117 Wis. 2d 48, 343 N.W.2d 418 (Ct. App. 1983). In *Bitters,* the court of appeals addressed a shareholder's request to inspect "interim corporate financial statements." *Id.* at 48. The circuit court in *Bitters* concluded that the interim financial statements were not within the scope of corporate documents to which a shareholder's right of inspection under § 180.43(1) applied. *Id.* at 49. In affirming the circuit court, the court of appeals concluded that a corporation's obligation to permit shareholder inspection of the "books and records of account . . . undoubtedly [is] one for an annual financial statement." *Id.* at 51.

¶ 153. Here, the majority opinion presumes that Evald had an obligation to maintain documentation underlying an annual financial statement, the March

---

[11] *Bitters* does not specify which version of Wis. Stat. § 180.43(1) it interpreted; however, the relevant text of the statute is the same as the above-quoted 1987–88 version. *See Bitters v. Milcut, Inc.,* 117 Wis. 2d 48, 50 n.1, 343 N.W.2d 418 (Ct. App. 1983).

31, 2001 balance sheet.[12] However, such an obligation does not arise under either the proposed buy-sell agreement or under a statute.

¶ 154. And finally, even if Evald had maintained the documentation underlying the March 31, 2001 balance sheet on which Hauser asserted that he calculated the book value of Evald, a court, nevertheless, could not calculate the book value of Evald. This is so because of the irretrievable indefiniteness inherent in the undefined, essential term "book value" in the proposed buy-sell agreement.

¶ 155. To explain further, book value may be based on different valuation methods and still be called "book value." The proposed buy-sell agreement gives no direction as to whether the assets were to be valued on a cost basis, a tax basis, a fair market value basis or some other basis when a shareholder is being bought out. Each choice would produce a different book value. Also, there is no indication of how the liabilities were to be valued. The documentation from which the March 31, 2001 balance sheet was constructed might indicate on what basis the March 31, 2001 balance sheet was stated, but it will not indicate whether the valuation basis used for the balance sheet comports with the term "book value" in the proposed buy-sell agreement. Accordingly, the missing, underlying records do not remove the necessity to analyze whether the proposed buy-sell agreement is indefinite or merely ambiguous.

## III. CONCLUSION

¶ 156. I conclude that the parties had no binding buy-sell agreement in regard to valuing a shareholder's interest in Evald because the proposed buy-sell agree-

---

[12] *See* majority op., ¶ 60.

ment is irretrievably indefinite in that it does not define an essential term of the proposed agreement, i.e., on what basis Evald's assets and liabilities are to be valued in calculating book value. Accordingly, I conclude that the proposed buy-sell agreement is unenforceable.

¶ 157. I also conclude that the majority's theory that the proposed buy-sell agreement is unenforceable due to Hauser's failure to preserve sufficient corporate records to verify Evald's March 31, 2001 balance sheet rests on three unspoken assumptions, with which I am not in agreement. The first assumption is that the proposed buy-sell agreement between Ehlinger and Hauser intended Evald's March 31, 2001 balance sheet to be the basis for determining book value no matter on what basis that balance sheet's assets and liabilities were valued. The second assumption is that Hauser had an obligation to maintain documents sufficient to verify Evald's March 31, 2001 balance sheet. The third assumption is that having the documents that underlie Evald's March 31, 2001 balance sheet will cure any ambiguity or indefiniteness in the proposed buy-sell agreement. None of those assumptions is warranted. Accordingly, for the reasons set forth above, I respectfully concur.

¶ 158. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). The majority opinion affirms the decisions of the circuit court and the court of appeals that the buyout (Buy-Sell) agreement, under all the facts and circumstances, is unenforceable; and it remands the case to the circuit court for appointment of a receiver. I concur in these determinations.

¶ 159. I do not agree, however, that the circuit court erred when it permitted Evald Moulding, Inc. to pay attorney fees for representation of the corporation and its president, chief executive officer, and treasurer,

344

Jon A. Hauser, who also is a corporation director. In my view, the majority's decision on this issue overlooks critical facts and results in a mistaken interpretation of the indemnification provisions of the Wisconsin corporation statutes. Because the majority's decision on indemnification of attorney fees has ramifications well beyond this case, I respectfully dissent.

I

¶ 160. Dr. William Ehlinger was a dentist who practiced in Watertown. In addition to his dental practice, Dr. Ehlinger invested in a number of business enterprises, including Evald Moulding, Inc. From 1981 until 1985, Dr. Ehlinger, Jon Hauser, and a third shareholder, James Safford, each owned one-third interest in Evald. In 1985 Dr. Ehlinger and Hauser bought out Safford's interest. In 1989 Hauser took over running the business. In 1992 Dr. Ehlinger and Hauser entered into the Buy-Sell Agreement at issue in this case.

¶ 161. The 1992 Buy-Sell Agreement included the following provisions:

> 3. *Transfer upon Disability.* Upon a Shareholder becoming *totally disabled as defined hereafter,* for a period of twenty-four (24) consecutive months, the other Shareholder shall have *the first right* to purchase all or part of the stock owned by the disabled Shareholder. *Any part of the stock owned by the disabled Shareholder not initially purchased by the other Shareholder shall then be offered to the Corporation for purchase.* Any part of the stock owned by the disabled Shareholder not purchased by the Corporation must then be purchased by the other Shareholder. The disabled Shareholder or his legal representative shall sell all of the stock owned by the disabled Shareholder at

the Agreed Purchase Price as defined in Section 6 hereof upon the terms and conditions set forth herein. *If there is no disability buy-out insurance for a Stockholder, "totally disabled" as used herein shall be defined as being unable to perform all the substantial and material duties of his employment with Evald Moulding Company, Inc.; or of the occupation or profession he practiced on the date he became disabled. . . .*

. . . .

6. *Purchase Price.*

(a) *For transfers of all of a Shareholder's stock at his death, or upon his becoming disabled, the purchase price of a Shareholder's shares of stock shall be $350,000.00 or Book Value whichever is greater,* except if the Shareholders have determined by unanimous resolution passed subsequent to the date of this agreement that the purchase price shall be other than $350,000.00, then the most recent such resolution shall determine the purchase price. For transfers of all of a Shareholder's stock on threat of involuntary transfer, the purchase price of a Shareholder's shares of stock shall be the book value of said shares as of the end of the last fiscal year.

. . . .

(3) For transfers on a Shareholder being disabled for twenty-four (24) consecutive months, except for payment funded by disability buy-out insurance, *payment shall be made 20% within ninety (90) days of the end of the twenty-four (24) consecutive months of disability, and 80% within sixty (60) months after said initial payment.* The portion of the purchase payment not paid within ninety (90) days of the end of the twenty-four (24) consecutive months of disability *shall* bear annual interest equal to the prime rate at Bank One, Watertown, Wisconsin, or at its successor banking institution, and shall be adjusted at the end of each annual quarter. Interest shall be paid at the end of each

346

annual quarter, and there shall be no prepayment penalty. For transfers upon such twenty-four (24) consecutive month disability which are funded by disability buy-out insurance payment shall be sought from the insurer and paid over to the disabled Shareholder, as soon as practicable.

. . . .

8. *Closing of Transactions.* The Closing of any transaction hereunder shall take place at the principal office of the Corporation on the date agreed upon by the parties, provided however, that unless otherwise agreed:

. . . .

(b) *Disability Transfers. In the event of a transfer upon disability as hereinabove provided, such closing for payments not funded by insurance, shall take place for the first 20% payment, at 10:00 a.m. on the 90th day after twenty-four (24) consecutive months of disability. The remaining 80% shall be payable on a monthly basis with interest as set forth in paragraph 6(b)(3) above.*

(Emphasis added.)

¶ 162. In May 1993 Dr. Ehlinger was diagnosed with Parkinson's disease. He took a leave of absence from his dental practice to seek medical treatment. He was never able to resume his practice but did engage in other business activities.

¶ 163. In December 2000 Dr. Ehlinger asked Hauser to make an offer for his one-half interest in Evald. Majority op., ¶ 11. In June 2001 Hauser sent a letter to Dr. Ehlinger invoking the disability provision of the Buy-Sell Agreement. Majority op., ¶ 12. Hauser calculated the book value of Dr. Ehlinger's shares in Evald at $431,400. *Id.* Dr. Ehlinger did not accept this purchase offer, which was based on Evald's most recent fiscal year-end statement. *Id.*

347

¶ 164. Dr. Ehlinger may have been annoyed at the manner in which Hauser made his purchase offer. He clearly was not satisfied with the size of the offer. He subsequently called a meeting of the shareholders and directors for April 22, 2002. Dr. Ehlinger made a motion at that meeting that Evald's books be audited but it was not adopted. The shareholders failed to elect directors. *Id.*, ¶ 13. Hauser's subsequent effort to close on his earlier purchase offer also failed when Dr. Ehlinger refused to cash Hauser's 20 percent check.

¶ 165. On April 30, 2003, Dr. Ehlinger filed suit against Hauser and Evald Moulding. The suit asked the court to (1) dissolve the corporation and appoint a receiver, as provided in Wis. Stat. §§ 180.1431 and 180.1432; (2) obtain an accounting of a separate dissolved partnership and liquidate and distribute its assets; (3) declare the respective rights of the parties under the 1992 Buy-Sell Agreement; and (4) issue a preliminary injunction against Hauser to restrain him from implementing redemption of Dr. Ehlinger's stock or exercising a proxy vote of Dr. Ehlinger's shares.

¶ 166. In his suit, Dr. Ehlinger described Hauser as "the President, Treasurer and Chief Executive Officer of Evald Moulding, Inc." Dr. Ehlinger alleged that he sought dissolution of Evald, in part, "because of the actions of defendant Hauser." He complained about the amount of compensation and bonuses paid to Hauser; the employment and compensation of Hauser's relatives; the amount and nature of expenses paid to Hauser and his relatives; Hauser's refusal to consider Ehlinger's relatives for employment by Evald; and "the nonpayment of dividends."

¶ 167. The suit alleged: "On March 26, 2002, the plaintiff served notice of an annual meeting of the shareholders and *directors* of Evald to address the

matters that were in dispute regarding the operation of Evald." (Emphasis added.) At the April 22 meeting, Dr. Ehlinger made numerous motions. These motions were recounted in the complaint. The complaint alleged that the "defendant refused" to approve Dr. Ehlinger's motions. The complaint distinguished actions not approved by "the shareholders" from motions not approved by the "defendant."

¶ 168. The complaint stated: "the *directors* of Evald are deadlocked in the management of its corporate affairs." (Emphasis added.)

¶ 169. The complaint twice asserted that financial statements of the corporation were "prepared by the defendant [Hauser]."

¶ 170. Paragraph 33 stated:

> The defendant has assumed total control of Evald and has for over 7 years operated Evald in a manner that benefits primarily and disproportionately the defendant and the members of his family. The defendant is thus acting and will act in a manner that is oppressive to the plaintiff, which constitutes grounds for the judicial dissolution of the corporation at the request of the plaintiff under Section 180.1430(2)(b) of the Wisconsin Statutes.

¶ 171. In sum, although Hauser was undoubtedly a shareholder, he is repeatedly referred to in the complaint in his capacity as an officer or director.

¶ 172. In the complaint, Dr. Ehlinger also named Evald Moulding as a defendant. The suit alleged that "Evald is named as a defendant because plaintiff seeks judicial *dissolution of Evald* because of impasse and because of the actions of defendant Hauser." Complaint, ¶ 3 (emphasis added). Dr. Ehlinger asked that a receiver be appointed by the court. He asked that the

receiver, in turn, "make an accounting" of the corporation and "dispose of its business." The complaint was signed by Attorney Ralph J. Ehlinger.

¶ 173. The critical issue in this dissent is whether the circuit court erred when it permitted the corporation to pay attorney fees to represent the corporation's rights and interests in litigation to dissolve the corporation, and attorney fees to represent its officer/director Jon Hauser, whose conduct is alleged to provide the grounds for dissolution. In short, did the circuit court err in allowing attorney fees after thoroughly considering the facts above?

II

¶ 174. In the 1980s, a national "director and officer liability crisis" led to enactment of legislation to "give added protection to corporate officials who act within the scope of their corporate duties." Paul Milakovich, *A Comprehensive Approach: Director and Officer Indemnification in Wisconsin*, 71 Marq. L. Rev. 407, 407 (1988). Wisconsin passed legislation to address this "crisis" in 1987. 1987 Wis. Act 13. The new legislation created Wis. Stat. § 180.044 (1987–88). 1989 Wis. Act 303 renumbered § 180.044 to § 180.0851 and made insignificant modifications. Section 180.0851 now reads:

> Mandatory indemnification. (1) A corporation shall indemnify a director or officer, to the extent that he or she has been successful on the merits or otherwise in the defense of a proceeding, for all reasonable expenses incurred in the proceeding if the director or officer was a party because he or she is a director or officer of the corporation.
>
> (2)(a) In cases not included under sub. (1), a corporation shall indemnify a director or officer against

liability incurred by the director or officer in a proceeding to which the director or officer was a party because he or she is a director or officer of the corporation, unless liability was incurred because the director or officer breached or failed to perform a duty that he or she owes to the corporation and the breach or failure to perform constitutes any of the following:

1. A willful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director or officer has a material conflict of interest.

2. A violation of the criminal law, unless the director or officer had reasonable cause to believe that his or her conduct was lawful or no reasonable cause to believe that his or her conduct was unlawful.

3. A transaction from which the director or officer derived an improper personal profit.

4. Willful misconduct.

(b) Determination of whether indemnification is required under this *subsection* shall be made under s. 180.0855.

(c) The termination of a proceeding by judgment, order, settlement or conviction, or upon a plea of no contest or an equivalent plea, does not, by itself, create a presumption that indemnification of the director or officer is not required under this subsection.

(3) A director or officer who seeks indemnification under this section shall make a written request to the corporation.

(4)(a) Indemnification under this section is not required to the extent limited by the articles of incorporation under s. 180.0852.

(b) Indemnification under this section is not required if the director or officer has previously received

351

indemnification or allowance of expenses from any person, including the corporation, in connection with the same proceeding.

Wis. Stat. § 180.0851 (emphasis added).

¶ 175. In his Comment, Paul Milakovich made the following observations:

Wisconsin has recently joined numerous other states in passing protective statutes . . . . With the adoption of these statutes, directors and officers of Wisconsin corporations can make decisions without the unreasonable threat of outrageous litigation expenses or personal liability.

. . . .

In codifying its indemnification provisions for directors and officers, the Wisconsin legislature took a rather unique approach. While most states have adopted mandatory indemnification provisions in limited situations and permissive indemnification in all others, Wisconsin has combined both approaches into a single mandatory indemnification section. Wisconsin continues to require a corporation to indemnify its directors and officers to the extent they were successful on the merits in the defense of a proceeding. However, the difference under the 1987 legislation can be seen in circumstances which do not fall within this "success on the merit" language. Section 180.044(2) of the Wisconsin Statutes now provides that a corporation shall indemnify a director or officer against liability unless it is determined that the director or officer breached or failed to perform a duty he or she owed to the corporation and the breach or failure to perform constitutes:

(a) A wilful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director or officer has a material conflict of interest;

(b) A violation of criminal law, unless the director

352

or officer has reasonable cause to believe his or her conduct was lawful or no reasonable cause to believe his or her conduct was unlawful;

(c) A transaction from which the director or officer derived an improper personal profit; or

(d) Wilful misconduct.

If any of these criteria occur, the director or officer cannot be indemnified under Wisconsin law. Like the statute dealing with the limitation of a director's liability, this provision applies to all Wisconsin corporations unless the corporation provides otherwise.

*Milakovich, supra,* at 428–29 (footnotes omitted).

The area of director and officer indemnification is one in which the Wisconsin legislature has adopted a vastly different approach than that adopted by other states. Most states require indemnification to the extent a director or officer is successful on the merits of his or her actions and they permit indemnification in most other circumstances. Wisconsin, on the other hand, requires indemnification in instances when the officer or director is successful on the merits and in situations in which the corporate official is not successful on the merits, as long as the individual's conduct does not fall within the statutory exclusions. This indemnification provision is unique in that it provides a director or officer the assurance that indemnification will be available, unless the corporation limits this right in its articles of incorporation.

*Id.* at 436 (footnotes omitted).

¶ 176. These 1988 observations are echoed in the Wisconsin Practice Series by Jay E. Grenig and Nathan Fishbach. They write:

The "mandatory" indemnification rights are straightforward and consistent with common past prac-

tices. They are not mandatory, however, since any corporation may limit them in its articles of incorporation. Under these provisions, an officer or director is entitled to indemnification for expenses (including reasonable attorney fees) if they successfully defend in a proceeding in which they are a party because they are such officer or director. Even if the officer or director is unsuccessful in its defense of a proceeding, it is entitled to indemnification by the corporation for all liability, including expenses, unless the liability resulted from criminality, willful misconduct, conflict of interest, or improper personal profit by the director.

2 Grenig & Fishbach, *Wisconsin Practice Series: Methods of Practice* § 52.71 (4th ed. 2004).[1]

### III

¶ 177. We must examine the text of Wis. Stat. § 180.0851, considering this historical and analytical background. Subsection (1) reads as follows:

*Mandatory indemnification.* (1) A corporation *shall* indemnify a director or officer, to the extent that he or she has been successful on the merits or otherwise in the defense of a proceeding, for all reasonable expenses incurred in the proceeding if the director or officer was a party because he or she is a director or officer of the corporation.

Wis. Stat. § 180.0851(1) (emphasis added).

¶ 178. This subsection presents several obvious questions in light of Jon Hauser's status as a director and officer, as well as a shareholder. What does the phrase "if the director or officer was a party *because he*

---

[1] Dr. Ehlinger does not point to any limitation on indemnification in Evald Moulding's articles of incorporation in this case.

*or she is a director or officer of the corporation*" mean? Does it mean that if the "director or officer" also is a significant shareholder, the director or officer loses his right to mandatory indemnification? Does it mean that if a director or officer is sued partly in his capacity as a director or officer and partly in his capacity as a shareholder, the director or officer loses his right to mandatory indemnification?

¶ 179. In my view, a director or officer has a *right* to indemnification "to the extent that he or she has been successful on the merits or otherwise in the defense of a proceeding . . . if the director or officer was a party because he or she is a director or officer of the corporation." Wis. Stat. § 180.0851(1).

¶ 180. The lengthy rendition of the facts in this dissent establishes beyond dispute that Hauser was sued in large part because of his actions as a director or officer. For instance, in Paragraph 33 of the Complaint, quoted in ¶ 170 above, Hauser is accused of acting in a "manner that is oppressive to the plaintiff, which constitutes grounds for the judicial dissolution of the corporation . . . under Section 180.1430(2)(b)." Section 180.1430(2)(b) provides that the circuit court may dissolve a corporation if a shareholder [e.g., Dr. Ehlinger] establishes "(b) [t]hat the *directors or those in control of the corporation* [e.g., Hauser] have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent." Wis. Stat. § 180.1430(2)(b) (emphasis added).

¶ 181. Paragraph 33 of the complaint is only part of the evidence that Hauser was sued in his capacity as a director or officer. Dr. Ehlinger alleged that Hauser prepared the financial statements, and Hauser was forced to defend them. Dr. Ehlinger alleged that Hauser refused to consider Dr. Ehlinger's relatives for employ-

ment. In my view, any interpretation of the statute that disqualifies a director or officer from mandatory indemnification if the director or officer is not sued *exclusively* as a director or officer, is dead wrong.

¶ 182. A second question in interpreting Wis. Stat. § 180.0851(1) concerns the phrase "to the extent that he . . . has been successful on the merits or otherwise in the defense." By its terms, this phrase cannot mean that the director or officer *must* prevail on the bottom line or in every respect.

¶ 183. One of the critical issues in the litigation was whether Dr. Ehlinger was disabled, thereby giving Hauser the right to invoke the disability provision of the Buy-Sell Agreement. Dr. Ehlinger alleged in his complaint that he "is not totally disabled and has not in the past been totally disabled for purposes of the 1992 Buy-Sell Agreement." *See,* complaint at ¶ 48. The circuit court found, however, that Dr. Ehlinger was "totally disabled" within the meaning of the agreement. *See* majority op., ¶ 23. This determination was made after a "five-day bench trial." *Id.* After this finding, the court moved on to a determination of "book value." In addition, many of Dr. Ehlinger's allegations against Hauser were never found as facts by the circuit court. The circuit court did not find that Hauser made "improper personal profit" or that his action was "illegal, oppressive or fraudulent." Moreover, even though the corporation is on track to be dissolved, it is not yet certain that Dr. Ehlinger's final share of the assets will exceed Hauser's offer of $431,400. As a result, it cannot be said that Hauser was not successful *to any extent* in the trial.

¶ 184. If Hauser was sued because he was a director or officer of the corporation and if he was successful "on the merits or otherwise" *to some extent* in the defense of the proceeding, he is entitled to "reasonable

356

expenses" as a matter of law. He is entitled to reasonable expenses "to the extent" he was successful, under Wis. Stat. § 180.0851(1).

¶ 185. Director/officer indemnification is not a matter of discretion under subsection (1). When certain facts are present, a director or officer has a right to indemnification. The circuit court must be given latitude to determine the "extent" of success and the reasonableness of expenses, but it cannot deny reasonable expenses altogether. The majority makes a profound legal error if it disqualifies Hauser because he was not sued *exclusively* as a director or officer or because he did not prevail completely in the circuit court.

¶ 186. The majority attempts to avoid clear answers to the issues surrounding § 180.0851(1) by asserting that Hauser failed to comply with the "formalities" of applying for indemnification under § 180.0851(1) by making a written request to the corporation, per § 180.0851(3). Majority op., ¶¶ 97–98.

¶ 187. The majority seriously suggests that Jon Hauser is disqualified from receiving the mandated indemnification under subsection (1) because he failed to sit down and write a letter to Evald's president, Jon Hauser, or Evald's treasurer, Jon Hauser, requesting payment of attorney fees. This disqualification assumes that there is no document that Hauser could produce that would qualify as "a written request" and that he could not make such a written request now. The majority does not come to grips with the meaning of Wis. Stat. § 180.0851(4)(b).

¶ 188. The majority then moves to Wis. Stat. § 180.0851(2), which also *requires* indemnification unless the director or officer "breached or failed to perform a duty" owed to the corporation but also requires the

director or officer to follow one of the "means" set out in Wis. Stat. § 180.0855 to secure indemnification.

¶ 189. Wisconsin Stat. § 180.0851(2) provides:

(2)(a) In cases not included under sub. (1), a corporation shall indemnify a director or officer against liability incurred by the director or officer in a proceeding to which the director or officer was a party because he or she is a director or officer of the corporation, unless liability was incurred because the director or officer breached or failed to perform a duty that he or she owes to the corporation and the breach or failure to perform constitutes any of the following:

1. A willful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director or officer has a material conflict of interest.

2. A violation of the criminal law, unless the director or officer had reasonable cause to believe that his or her conduct was lawful or no reasonable cause to believe that his or her conduct was unlawful.

3. A transaction from which the director or officer derived an improper personal profit.

4. Willful misconduct.

(b) *Determination of whether indemnification is required under this subsection shall be made under s. 180.0855.*

(c) The termination of a proceeding by judgment, order, settlement or conviction, or upon a plea of no contest or an equivalent plea, does not, by itself, create a presumption that indemnification of the director or officer is not required under this subsection.

(3) A director or officer who seeks indemnification under this section shall make a written request to the corporation.

358

(4)(a) Indemnification under this section is not required to the extent limited by the articles of incorporation under s. 180.0852.

(b) Indemnification under this section is not required if the director or officer has previously received indemnification or allowance of expenses from any person, including the corporation, in connection with the same proceeding. (Emphasis added.)

¶ 190. The majority does *not* deny attorney fees because the circuit court made a determination that Hauser "breached or failed to perform a duty that he" owed to the corporation "and the breach or failure" constituted one of the four disqualifying actions set out in subsection (2)(a)1. through 4. Rather, the majority concludes that Hauser may have been eligible for attorney fees under Wis. Stat. § 180.0851(2) but he failed to seek them in a proper manner under Wis. Stat. § 180.0855(5) ("By a court under s. 180.0854."). Majority op., ¶¶ 97, 103, 119.

¶ 191. There are two problems with this legal conclusion. First, there is no time limit for an application for indemnification. A director or officer who is a party to a proceeding may apply for indemnification to the court conducting the proceeding or to another court of competent jurisdiction. Wis. Stat. § 180.0854(1). The statute does not prescribe a time. In my view, it is not too late to apply now. *See* Wis. Stat. § 180.0851(4)(b). Support for this interpretation is found in Wis. Stat. § 180.0851(2)(c): "The termination of a proceeding by judgment [or] order . . . does not, by itself, create a presumption that indemnification of the director or officer is not *required* under this subsection." Wis. Stat. § 180.0851(2)(c) (emphasis added). If nothing else, Hauser applied to the court of appeals when he filed his brief in the cross-appeal.

¶ 192. Second, as the majority notes, "[o]n four occasions, [Dr.] Ehlinger asked the circuit court to enjoin Hauser from paying for the litigation with corporate funds." Majority op., ¶ 92. On four occasions, the court denied the motions. The court of appeals thereafter affirmed the circuit court. The majority seizes on another technicality—that Hauser did not *initiate* an application to the circuit court for approval of attorney fees—to avoid determining the issue on the merits. Nonetheless, four times the issue was before the circuit court. Four times the circuit court knew that the court was *required* to order indemnification if it determined that director Hauser or officer Hauser was entitled to indemnification under § 180.0851(1) or (2), or if director Hauser or officer Hauser was "fairly and reasonably entitled to indemnification in view of all the relevant circumstances, regardless of whether indemnification is required under s. 180.0851(2)." Wis. Stat. § 180.0854(2)(b). The court made four decisions. It is virtually impossible now for an appellate court to conclude that the circuit court erroneously exercised its discretion on either the facts or the law under subsection (2).

¶ 193. Unless the circuit court erroneously exercised its discretion, the amount of an attorney fee award typically is left to the discretion of the circuit court. *Stuart v. Weisflog's Showroom,* 2008 WI 22, ¶ 14, 308 Wis. 2d 103, 746 N.W.2d 762. Appellate review of an award of attorney fees is limited to whether the trial court properly exercised its discretion. *Benkoski v. Flood,* 2001 WI App 84, ¶ 10, 242 Wis. 2d 652, 626 N.W.2d 851 (citing *Hughes v. Chrysler Motors Corp.,* 197 Wis. 2d 973, 987, 542 N.W.2d 148 (1996)). "While the basis for an exercise of discretion should be set forth in the record, it will be upheld if the appellate court can

find facts of record which would support the circuit court's decision." *Peplinski v. Fobe's Roofing, Inc.,* 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995). Stated differently, "[a] reviewing court is obliged to uphold a discretionary decision of a trial court, if it can conclude *ab initio* that there are facts of record which would support the trial judge's decision had discretion been exercised on the basis of those facts." *Schmid v. Olsen,* 111 Wis. 2d 228, 237, 330 N.W.2d 547 (1983) (citing *Maier Constr., Inc. v. Ryan,* 81 Wis. 2d 463, 473, 260 N.W.2d 700 (1978)).

¶ 194. The discussion above pertains to Hauser personally, as a director and officer. But the corporation also was entitled to representation, because the circuit court determined that Evald Moulding was "more than a nominal party." Dr. Ehlinger's suit was, in part, a suit for declaratory judgment to determine the rights of the parties under the Buy-Sell agreement. The corporation was explicitly mentioned in the Buy-Sell Agreement and given authority to buy shares. More important, Dr. Ehlinger's suit was intended to dissolve the corporation. Corporate dissolution is not automatic. *Dickman v. Vollmer,* 2007 WI App 141, ¶ 27, 303 Wis. 2d 241, 736 N.W.2d 202. When the court appoints a receiver, however, the receiver may be paid "from the assets of the corporation." Wis. Stat. § 180.1432(4).

¶ 195. A corporation is an entity "distinct and apart from its members or stockholders." *Legion Clubhouse, Inc. v. City of Madison,* 248 Wis. 380, 385, 21 N.W.2d 668 (1946). A corporation is treated as an entity separate from its stockholders "under all ordinary circumstances." *Jonas v. State,* 19 Wis. 2d 638, 644, 121 N.W.2d 235 (1963). These judicial pronouncements are grounded in the corporation statutes, which provide in Wis. Stat. § 180.0302:

*General powers.* Unless its articles of incorporation provide otherwise, a corporation has perpetual duration and succession in its corporate name and has the same powers as a natural person to do all things necessary or convenient to carry out its business and affairs, including but not limited to power to do all of the following:

(1) Sue and be sued, complain and defend in its corporate name.

. . . .

(10) Conduct its business . . . and exercise the powers granted by this chapter in or outside this state.

Wis. Stat. § 180.0302.

¶ 196. The corporation's power to sue and be sued and to defend in its corporate name necessarily entails the right to retain and compensate counsel. In his complaint, Dr. Ehlinger asked the court to "dispose of [the corporation's] business." The corporation had the right to resist that request.

¶ 197. This court should not assume that, upon remand, a receiver will sell Evald Moulding, that Jon Hauser will purchase the corporation, and that Dr. Ehlinger will emerge from this litigation a much wealthier man. We do not know whether Hauser will have the means to purchase the business if he is forced to repay all attorney fees to the corporation. We do not know whether this corporation will survive in any form.

¶ 198. I believe the majority is incorrect on the facts and the law and is doing serious damage to Wisconsin's corporate indemnification statute. For the reasons herein stated, I respectfully dissent.

¶ 199. I am authorized to state that Justice MICHAEL J. GABLEMAN joins ¶¶ 159–198 of this opinion.

¶ 200. ANNETTE KINGSLAND ZIEGLER, J. (*concurring in part, dissenting in part*). I agree with the majority opinion that the circuit court erroneously exercised its discretion when it permitted the corporation, Evald Moulding, Inc. (Evald), to pay Jon Hauser's litigation expenses. Majority op., ¶¶ 111–113. However, I otherwise dissent from the majority opinion, which remands this case to the circuit court for the appointment of a receiver. I would instead remand the case to the circuit court for full development of the record.

¶ 201. Of great concern to me is the circuit court's appointment of a "special magistrate" who did not function purely as a referee or an expert witness and instead acted, without forewarning to the parties, as a hybrid of both. When a court appoints a referee or an expert witness, that appointee is subject to certain requirements which provide the parties with adequate safeguards and the ability to make a record. The procedures that provide these safeguards, however, are different depending on the type of appointment. In the case at issue, if the special magistrate was indeed appointed as a referee, the parties were denied those safeguards and thus were precluded from making a full record regarding the referee's actions. If, on the other hand, the special magistrate was appointed as an expert witness, the parties were denied their statutorily-imposed opportunity to depose and fully cross-examine him. A court that appoints such an individual should always ensure that the parties fully understand the role and scope of the appointee, and the appointee's involvement should never effectuate as a denial of the parties' right to fully develop the case and make a complete record. Here, I dissent because the parties were deprived of the opportunity to fully develop evidence and make a complete record.

¶ 202. In addition, I believe that the majority opinion errs by concluding that it "need not resolve whether the buyout agreement is indefinite, ambiguous, neither, or both because resolution of that question would not change the outcome of this case." Majority op., ¶ 59. If the agreement is ambiguous, then this case should return to the circuit court for a trial on the determination of the ambiguous language. In contrast, if the agreement is indefinite, then it is unenforceable. However, since the parties were deprived of the opportunity to develop their case below, I would reserve that issue and remand this case to the circuit court for discovery and for a determination after the parties have been allowed the opportunity to fully develop their arguments. For those reasons, I respectfully dissent.

¶ 203. In this case, the circuit court appointed Del Chmielewski, a certified public accountant, as a "special magistrate" to "determine Evald's March 31, 2001 book value using generally accepted accounting principles [GAAP] which are appropriate for the size, function and structure of this corporation." The circuit court further instructed the special magistrate to "advise the Court of any departures from GAAP in his report to the Court" and to "report any substantial inconsistencies in the reporting methodology used by Evald in 2001 vis á vis the previous two years." As the majority opinion points out, *see* ¶ 27, it is not clear under what authority the circuit court appointed the special magistrate. From the record now before this court, it appears that the special magistrate did not function purely as a referee or an expert witness and instead morphed into a hybrid of both with the parties being deprived of the safeguards of each.

¶ 204. The statutes providing for court-appointed referees and expert witnesses are rife with procedural

safeguards that ensure litigants due process of law. Mandating that court-appointed referees "shall be the exception and not the rule," Wis. Stat. § 805.06 permits the court to appoint a referee "when the issues are complicated," including "matters of account and of difficult computation of damages." *See* §§ 805.06(1), (2). Relevant to this case, the court may direct the referee "to receive and report evidence only," § 805.06(3), but the referee must prepare a report upon the matters submitted by the court's order and "shall file the report with the clerk of the court," § 805.06(5)(a). "Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties." § 805.06(5)(b).

¶ 205. On the other hand, pursuant to Wis. Stat. § 907.06, the court may appoint an expert witness. The court-appointed expert witness "shall be informed of the witness's duties by the judge in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate." § 907.06(1). The court-appointed expert witness "shall advise the parties of the witness's findings" and may be deposed by any party, may be called to testify by the judge or any party, and "shall be subject to cross-examination by each party." *Id.*

¶ 206. From the record before this court, it appears that the court-appointed "special magistrate" was a referee turned expert witness. The circuit court appointed the special magistrate to determine Evald's March 31, 2001 book value, which arguably is a "matter[] of account" for which a referee is appointed under Wis. Stat. § 805.06(2). The circuit court instructed the parties that they are "required to answer inquiries of the Special Magistrate" but clarified that it does not want advocacy. Furthermore, in a statement latched

onto by both the court of appeals, *Ehlinger v. Hauser*, 2008 WI App 123, ¶ 42, 313 Wis. 2d 718, 758 N.W.2d 476, and the majority opinion, *see* ¶ 85, the circuit court denied that the special magistrate was "anybody's expert witness."

¶ 207. Nevertheless, the special magistrate emerged as at least a quasi expert witness. He was called to testify, and the circuit court permitted the parties to conduct a limited cross-examination of him:

> Regarding calling the special magistrate as witness, I didn't talk to Mr. Chmielewski about this, but I would allow either of you to question him regarding just a couple of things which are essentially clarification of his reports. One is any arithmetical calculation he's made; two is what, what sources he had as a base to the figures that he used; and third, the opinions that he made in his report to the Court. He's not anybody's expert witness; but I would, if you have questions just on those aspects of his report, allow him to testify.

Indeed, during the limited cross-examination, the special magistrate was asked whether he was able to form an opinion on Evald's March 31, 2001 book value "to a reasonable degree of accounting certainty." A degree of certitude is a requirement placed on expert witnesses. *See Drexler v. All Am. Life & Cas. Co.*, 72 Wis. 2d 420, 432, 241 N.W.2d 401 (1976) (citing *State v. Wind*, 60 Wis. 2d 267, 273, 208 N.W.2d 357 (1973)). Finally, the special magistrate never filed his report, or any accompanying transcripts or exhibits, with the clerk of court as statutorily required of referees under Wis. Stat. § 805.06(5)(a).[1] Without the requisite filing, the parties

---

[1] In its entirety, Wis. Stat. § 805.06(5)(a) provides:

The referee shall prepare a report upon the matters submitted by the order of reference and, if required to make findings of fact and

could not have been clear as to the special magistrate's role and their rights and obligations thereto, including the opportunity to object "[w]ithin 10 days after being served with notice of the filing." *See* § 805.06(5)(b).

¶ 208. Despite acknowledging these "certain procedural irregularities," majority op., ¶ 88, the majority opinion nevertheless concludes that "[t]he record does not evince an understanding by the parties that the special magistrate was appointed as an expert witness," *id.*, ¶ 83. The majority opinion further concludes that "Hauser forfeited his right to object to the procedures specified by the court in the reference." *Id.*, ¶ 87. The majority opinion opportunely frames Hauser's objection as one aimed at the procedures in the court's reference. By doing so, the majority evades the fact that if indeed the special magistrate was appointed as a referee, Hauser had "10 days after being served with notice of the filing of the report" to object. *See* Wis. Stat. § 805.06(5)(b). It is undisputed that the special magistrate never filed his report with the clerk of court.

¶ 209. Accordingly, if the special magistrate was indeed appointed as a referee, the parties were precluded from making a full record regarding the referee's actions. If, on the other hand, the special magistrate was appointed as an expert witness, the parties were not given their statutorily-imposed opportunity to depose and fully cross-examine him. Without the benefit of either of those requirements, the majority concludes that the case should be remanded for the appointment

conclusions of law, the referee shall set them forth in the report. The referee shall file the report with the clerk of the court and in an action to be tried without a jury, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits. The clerk shall forthwith mail to all parties notice of the filing.

367

of a receiver. Because the parties were deprived of the opportunity to fully develop evidence and make a complete record, I would instead remand the case to the circuit court for full development of the record.

¶ 210. In addition, I dissent from the majority opinion's conclusion that it "need not resolve whether the buyout agreement is indefinite, ambiguous, neither, or both because resolution of that question would not change the outcome of this case." Majority op., ¶ 59. To the contrary, if words or phrases in an agreement are ambiguous, as in reasonably susceptible of more than one meaning, then it is the court's duty to determine the parties' intent at the time the agreement was entered into. *Capital Invs., Inc. v. Whitehall Packing Co., Inc.,* 91 Wis. 2d 178, 189–90, 280 N.W.2d 254 (1979) (citing *Patti v. W. Mach. Co.,* 72 Wis. 2d 348, 351–52, 241 N.W.2d 158 (1976)). To make that determination, the court "may look beyond the face of the contract and consider extrinsic evidence." *Id.* at 190. Such extrinsic evidence may include the parties' own testimony regarding what they intended the agreement to mean. *Patti,* 72 Wis. 2d at 354–55. Consequently, the majority opinion is incorrect when it concludes that the agreement need not be adjudged ambiguous "[because] the contract cannot be enforced regardless of how the term ['book value'] could be defined." Majority op., ¶ 59. If the agreement is determined to be ambiguous, then this court should remand the case for a full trial on the determination of the ambiguous language—not remand for the appointment of a receiver.

¶ 211. However, if the agreement is indefinite, as the concurrence, Justice Patience Drake Roggensack, concludes, then "no enforceable agreement has been made because the parties have not agreed to their particularized obligations." Justice Roggensack's con-

currence, ¶ 134 (citing *Shetney v. Shetney,* 49 Wis. 2d 26, 38, 181 N.W.2d 516 (1970); 1 Joseph M. Perillo, *Corbin on Contracts* § 4.13, 634–37 (rev. ed. 1993)).

¶ 212. Here, since the parties were deprived of the opportunity to develop their case below, I would reserve the issue of whether the agreement is ambiguous or indefinite and remand this case to the circuit court for discovery and for a determination after the parties have been allowed the opportunity to fully develop their arguments. For the foregoing reasons, I respectfully concur in part and dissent in part.

¶ 213. I am authorized to state that Justice MICHAEL J. GABLEMAN joins this dissent ¶¶ 201—212 of this opinion.